UNITED STATES of America,
Plaintiff-Appellee,

v.

Valentin ESCAMILLA and Cosme Sanes
Escamilla, Defendants-Appellants.

No. 76–3658.

United States Court of Appeals,
Fifth Circuit.

Oct. 14, 1977.

L. Aron Pena, Edinburg, Tex., for defendants-appellants.

James R. Gough, Jr., U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., Rene J. Gonzalez, Asst. U. S. Atty., Laredo, Tex., for plaintiff-appellee.

Before TUTTLE, WISDOM and COLEMAN, Circuit Judges.

TUTTLE, Circuit Judge:

On May 4, 1976, Border Patrol Agents Ortiz and Casas were monitoring traffic at the intersection of Highways 16 and 359 near Hebbronville, Texas. Hebbronville is situated some 70 miles from the Mexican border via the most direct route. At approximately 9:30 a. m., the agents were alerted by "Chekar" signals that several vehicles were approaching the intersection on Highway 359, which originates at Laredo, Texas. The Chekar device was imbedded in Highway 359 some 12 miles west of Hebbronville. Agent Ortiz testified that the agents observed a 1968 Chevrolet truck, a Continental Trailways bus and a 1973 Hornet car approach the intersection. It was later determined that appellants Cosme Sanes Escamilla and Valentin Escamilla were driving the truck and automobile respectively. The truck made a left turn and proceeded north on Highway 16 toward Freer, Texas, and the car followed, after stopping for a red light at the intersection. The bus turned south on Highway 16.

Agents Ortiz and Casas testified that after viewing the sequence of events described above, they became suspicious of appellants' activities. They said their suspicions were grounded upon several factors. First, the truck had out-of-county license plates (Bexar County) and made a left turn on Highway 16 going toward Bexar County. Second, both the truck and the car were traveling close to a commercial bus. The agents were aware of reports that smugglers and transporters of illegal aliens travel close to busses in hopes of escaping detection, while the agents occupy themselves with the immigration check on the bus. Finally, as appellants proceeded through the intersection, neither "acknowledged the presence" of the agents' vehicle parked at the intersection, i. e. appellants stared straight ahead.

Their suspicions aroused, Agents Casas and Ortiz abandoned their original plan to conduct an immigration check on the bus and followed appellants. The agents immediately passed the car driven by Valentin Escamilla in order to obtain a better view of the truck. Again Valentin Escamilla did not look at the agents as they passed and immediately fell back some distance from the agents' vehicle. From their vantage point behind the truck, the agents observed that the truck was loaded with bales of hay, that the bales were "clumsily stacked" and that there were 4″ gaps between some of the bales. From these factors, the agents suspected that the truck contained secret compartments, with gaps between the bales to provide air for illegal aliens. Although neither had observed aliens transported in this manner, both had "heard reports" of similar incidents. A decision was made to stop the truck for an immigration check.

While Agent Ortiz questioned Cosme Escamilla as to his citizenship, Agent Casas peered through some cracks in the side board of the truck, seeing what he thought to be burlap sacks. Agent Casas also detected a "strong odor" of marijuana emanating from the truck. Based on these observations, the agents searched the truck and discovered 2,844 pounds of marijuana

underneath the bales of hay.[1] After finding the marijuana, Agent Ortiz drove north on Highway 16, stopped the vehicle driven by Valentin Escamilla and placed him under arrest. Ortiz testified that he had thought the two vehicles were connected because, after turning north on Highway 16, the truck slowed down, enabling the car to negotiate the turn and catch up.

Following a jury trial in the United States District Court, Southern District of Texas, appellants were convicted of conspiracy to possess and possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846. Prior to trial on the merits, appellants moved to suppress all evidence obtained by means of the allegedly unlawful search of their vehicle. The trial court, convinced that the evidence sufficed to meet the "reasonable suspicion" standard applicable to investigatory stops by roving border patrols, denied the motion. We reverse.

## I. *The Legal Standard*

The decision in this case is controlled by the principles announced in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In that case, the Court held that

> "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country."

*Id.* at 884, 95 S.Ct. at 2582. Although the Court catalogued several factors which may be taken into account in deciding whether reasonable suspicion exists, *id.* at 884–85, 95 S.Ct. 2574, it emphasized that "[e]ach case must turn on the totality of the particular circumstances." *Id.* at 885 n. 10, 95 S.Ct. at 2582.

Our Court has had numerous occasions to apply the *Brignoni-Ponce* standards. The vast majority of cases, however, involved

such clearly suspicious circumstances that it is difficult to determine precisely where the line has been drawn. *See, e. g., United States v. Payne,* 555 F.2d 475, 477–78 (5th Cir. 1977) (vehicle on highway used to transport aliens had heavy-duty shocks, blacked-out rear windows and appeared heavily loaded); *United States v. Barnard,* 553 F.2d 389, 391–92 (5th Cir. 1977) (two cars, one appearing heavily loaded, both equipped with C.B. radios, in secluded border area using "lead car, load car" scheme); *United States v. Macias,* 546 F.2d 58, 62 (5th Cir. 1977) (vehicle executed "turn around" at fixed checkpoint near border); *United States v. Canales,* 527 F.2d 440, 441 (5th Cir. 1976) (per curiam) (agent observed six Mexican men carrying large sacks and weapon one mile from border; vehicle with six Mexican passengers subsequently emerged from the same location); *United States v. Estrada,* 526 F.2d 357, 358 (5th Cir. 1976) (per curiam) (vehicle attempted to evade officers after vehicle immediately in front stopped for citizenship check); *United States v. Nunn,* 525 F.2d 958, 959 (5th Cir. 1976) (anonymous tip that six aliens were in open bed of truck); *United States v. Walker,* 522 F.2d 194, 195 (5th Cir. 1975) (per curiam) (high-speed chase of three heavily-loaded vehicles); *United States v. Lara,* 517 F.2d 209, 210–11 (5th Cir. 1975) (heavily-loaded camper on gravel road, two miles from Rio Grande). Although this case must turn on the particular circumstances involved, it is worthwhile to note that the "suspicious" activities here do not approach the type of activities involved in the above cases.

## II. *Applying the Standard*

On three separate occasions, this Court has stressed that a "vital" element of the *Brignoni-Ponce* test is whether the agents had "reason to believe that the vehicle [in question] had come from the border." *See United States v. Woodard,* 531 F.2d 741, 743 (5th Cir. 1976); *United States v. Martinez,* 526 F.2d 954, 955 (5th Cir. 1976);

---

1. The validity of the search itself is not challenged. Of course, if the stop was unlawful, the search incident to such stop was unlawful, and any evidence seized must be suppressed.

*United States v. DelBosque,* 523 F.2d 1251, 1252 (5th Cir. 1975) (per curiam). As an initial matter, we conclude that Agents Ortiz and Casas did not have reasonable grounds to believe appellants had come from the border. Appellants' vehicle was first detected on Highway 359 some 12 miles west of Hebbronville, Texas. By referring to the map printed as fn. 2 of the opinion of this Court in *United States v. Shields,* 534 F.2d 605 (5th Cir. 1976), it is clear that Highway 359 does run west from Hebbronville to Laredo and the Mexican border some 70 miles away. However, several small towns, including Aquilares, Oilton, Mirando City and Druval, are situated between the border and the location of the Chekar device. Also, at least three north-south highways intersect Highway 359 between those same coordinates. Considering these factors, it was pure speculation on the part of the agents to opine that appellants' journey originated at the border. To be sure, Agent Ortiz testified that he "assumed" appellants had come from Laredo and not from any point between Hebbronville and Laredo. One could "assume" appellants had come from Mexico City, but that would not be a reasonable inference to draw from the mere presence of appellants' vehicles on Highway 359. If the mere presence of a vehicle upon a public highway leading away from the border constitutes a sufficient "reason to believe" the vehicle in fact came from the border, an untold number of innocent travelers are daily subject to inclusion in this dangerous category.

In *United States v. Martinez,* 526 F.2d 954 (5th Cir. 1976), this Court *en banc* held that agents who, after receiving Chekar signals, stopped a vehicle traveling north on Road 1017 into Hebbronville acted illegally because "they had no reason to believe that the vehicle had come from the border or that [the driver] was violating any law." Hebbronville, by way of Road 1017 and Road 755, is 73 miles due north of the border city of Rio Grande City. Although Road 1017 does not itself go to the border, it joins 755 so that the road to Rio Grande is about as straight as the road to Laredo in this case. Thus, the proof here did not meet the "vital" test.

■ Although we have stated that having "reason to believe that the vehicle in question had come from the border" is a vital element of the *Brignoni-Ponce* test, it is not an essential element if other articulable facts "reasonably warrant suspicion." It is clear, however, that the absence of this element leaves the case to be decided solely on the remaining facts and circumstances with no inferences to be drawn on the assumption that the travelers had come from the border.

■ Agent Ortiz testified that the first thing to arouse his suspicion was the fact that the truck made a left turn on Highway 16. In this context, Ortiz stated:

"[T]he vehicle made a left turn on Highway 16 headed towards San Antonio, which on this Highway [359] is not very commonly done, because the vehicle coming from Laredo going towards that area usually takes Highway 59 or 35."

The evidence clearly indicates that the left turn itself was not suspicious. Agent Ortiz conceded that it would not be unusual for a vehicle to take Highway 16 to a farm or ranch north of Hebbronville or to go to Freer, Texas. Thus, it is evident such a maneuver aroused suspicion *only* because Ortiz assumed that appellants began their trip in Laredo and planned to travel to some point north of Freer. As we have pointed out, this assumption cannot be made. Even if such an assumption were "reasonable," it simply is not unusual that the particular route chosen by a driver does not coincide with a route Border Patrol Agents consider more direct or common. This is especially true when the driver is from another part of the state.

In an analogous context, the Fifth Circuit has rejected such dubious "suspicious circumstances." In *United States v. Frisbie,* 550 F.2d 335 (5th Cir. 1977), Border Patrol Agents stopped a vehicle because it was proceeding away from the border at a time of day when there normally was very little traffic. The court held that "[a] decision to travel such roads at less busy hours should

not be the difference—constitutionally speaking—determinative of the right of the officers to stop vehicles." *Id.* at 338. Why should a decision to execute a particular turn engender any more "reasonable" suspicion than a decision to travel at a particular time of day? At the very least, this factor should not be determinative of the agents' right to stop appellants' truck.

■ Agent Ortiz also testified that he felt appellants were traveling close to the commercial bus in order to avoid a citizenship check. Likewise, Agent Casas stated that

"we had information on several occasions from smuggling cases that were apprehended further north that they followed the bus through Hebbronville because they knew we were going to check the bus in Hebbronville."

There are several problems with this theory generally and in the context of the instant case. First, there was absolutely no basis for the agent's statement that "they knew we were going to check the bus at Hebbronville." Second, while it is true that agents may rely to some extent upon their experience to determine the appropriateness of stopping a vehicle, such experience should not be transformed into the type of irrebutable presumption evidenced here. That is, in the absence of other irregular conduct, the fact that a vehicle happens to be near a commercial bus should not create more than a scintilla of suspicion. Finally, even if the agents did suspect that appellants were employing a commonly-used scheme to avoid detection, that suspicion must have evaporated when appellants' vehicles and the bus turned in opposite directions. At that point, it should have been obvious to the officers that appellants were not going to "follow the bus through Hebbronville."

■ Throughout their testimony, Agents Ortiz and Casas made much of the fact that appellants did not "acknowledge the officers' presence" at the intersection. The agents thought it suspicious that appellants never looked at the marked patrol car. This particular factor cannot weigh in the balance in any way whatsoever. It is ask-

ing too much to believe the agents maintained eye contact with appellants from the time the vehicles came into view until they turned on Highway 16. Also, both appellants were in the process of turning their vehicles on a public highway—is it so unusual that they chose to look at the road rather than at the officers? Finally, characterizing appellants' failure to look or wave at the agents as "suspicious" will place other persons driving near the border in a most precarious position. In *United States v. Barnard,* 553 F.2d 389, 391–92 (5th Cir. 1977), the court found it suspicious that the driver of a vehicle "glanced repeatedly and nervously at [a Border Patrol Agent] as he passed." For the court to now hold that the opposite reaction to the officers' presence is a legitimate consideration in deciding whether to stop a vehicle would put the officers in a classic "heads I win, tails you lose" position. The driver, of course, can only lose.

The only other factor contributing to the stop in this case was provided by Agent Ortiz's observation that there were 4″ openings between some of the bales of hay stacked in the rear of appellants' truck. Ortiz testified that he *suspected* the gaps were left to permit air to go into a central compartment containing illegal aliens. In addition, Ortiz opined that the bales were "clumsily stacked." Photographs tendered as government exhibits do not, in our opinion, corroborate Ortiz's observations.

### III. *Conclusion*

■ The ultimate disposition of this case hinges upon one question: were Agents Ortiz and Casas "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant[ed] suspicion that [appellants'] vehicle contain[ed] aliens illegally in this country." *See United States v. Brignoni-Ponce,* 422 U.S. at 874, 95 S.Ct. at 2576. In answering this question, we are instructed to consider the "totality of circumstances" confronting the officers at the time. We simply cannot conclude that Agents Ortiz and Casas *reasonably* could have suspected appellants' ve-

hicle contained illegal aliens. The intellectual gymnastics required to reach a contrary conclusion are too formidable.

It should be clear that the left turn on Highway 16 and appellants' failure to look or wave at the agents deserve no consideration. As to the circumstances of the association of the two vehicles, standing alone, this Court dealt with such a situation in *United States v. Barnard,* 553 F.2d 389 (5th Cir. 1977). In *Barnard,* where a car designated "the Mercury" was found to be carrying marijuana, the court said:

> "On the basis of his four years of experience as a border patrolman in the area, Ozuna inferred that the MG might be a 'lead car' or 'scout car' and the Mercury a 'load car' carrying aliens. The Ninth Circuit particularly has taken note of this ' "lead car-load car" modus operandi, whereby two cars travel together during a smuggling venture *with the first car operating primarily as a scout car.'* *United States v. Padilla,* 500 F.2d 641, 643 (9th Cir. 1974); *United States v. Portillo,* 469 F.2d 907, 909–10 (9th Cir. 1972); *United States v. Figueroa-Espinoza,* 454 F.2d 590, 591 (9th Cir. 1972); *United States v. Baca,* 368 F.Supp. 398 (S.D.Cal. 1973) [footnote omitted]. Although observation of two cars in proximity on a sparsely traveled road does not itself justify a stop, it may understandably raise the officer's suspicions. *United States v. Larios-Montes,* 500 F.2d 941, 943 (9th Cir. 1974)." [5] [Emphasis added.]

[5.] "The fact that the first car to appear in the area in forty minutes was followed fairly closely by a second car could reasonably be expected to trigger the officers' suspicion of the lead car-load car modus operandi." *Id.*

"*On the other hand, it would be improper to infer that the lead car-load car scheme was being used when the purported scout car was actually following, rather than preceding, the lead car.* *United States v. Barragan-Martinez,* 504 F.2d 1155, 1157 (9th Cir. 1974)." [Emphasis added.]

In this case, of course, there was no proof even that this was a "sparsely traveled" road. In fact, the officers testified they let several cars pass because the drivers were recognized as locals. Moreover, the so-called "scout car" here was behind, rather than in front of, the "load car", a circumstance in the cases cited by this court which forbids the use of the "lead car-load car" inference. Moreover, in the *Barnard* case, the Court considered the "lead car-load car" inference to be bolstered by the presence of two-way CB radio equipment in both cars.

We cannot find that the mere circumstance that other instances of a similar nature had produced affirmative results is sufficient to rise to the level required to sustain a belief that the particular truck in question was carrying illegal aliens. In an analogous fact situation, this Court in *United States v. Byrd,* 483 F.2d 1196 (5th Cir. 1973), *aff'd on rehearing,* 494 F.2d 1284 (5th Cir. 1974) (per curiam),[2] the court found that appellant's vehicle had been stopped without the requisite reasonable suspicion of criminal activity and stated:

> "Other than the presence of the car on the highway at an hour when few vehicles were traveling between Laredo and Freer and the officers' knowledge that 'many cases' had been made 'at that time of morning . . . out there on that particular road,' there were no facts to arouse the officers' suspicions . . . . . Officer Escobedo said he and his partner have been just as suspicious of any other vehicle [under the same circumstances]."

483 F.2d at 1197. In the present case, the agents had heard of other instances where drivers traveled close to a bus or concealed aliens under produce; however, such "reports" cannot sustain a decision to stop every vehicle traveling near a bus or every truck loaded with farm produce. Nor can we do so if in addition, the vehicle makes a left turn towards the county of its license

**2.** In the first *Byrd* opinion, 483 F.2d 1196, the court applied standards announced in *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), to reverse the appellant's conviction. However, in denying a petition for rehearing en banc, the court subsequently stated that the reversal "was a sound and correct result in light of the Supreme Court's recent decision in *Brignoni-Ponce.*" *United States v. Byrd,* 520 F.2d 1101, 1103 (5th Cir. 1975).

plates and in doing so appears to ignore the presence of the agents at the road junction.

The *Brignoni-Ponce* standard is a difficult one to apply. It is open to such completely subjective determinations that the courts must draw a line beyond which the stopping of automobiles upon the "reasonable suspicion" grounds runs afoul of the Fourth Amendment. This is such a case.

The judgment is REVERSED and the case is REMANDED to the trial court for further proceedings not inconsistent with this opinion.