**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Eliseo A. RESENDEZ,
Defendant-Appellant.**

**No. 77–5683.**

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1978.

Charles L. Caperton, Dallas, Tex., Kenneth E. Labowitz, Alexandria, Va., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., Le Roy Morgan Jahn, Asst. U. S. Atty., Ronald P. Guyer and John E. Murphy, Trial Attys., San Antonio, Tex., for plaintiff-appellee.

Before GODBOLD, SIMPSON, and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Eliseo Resendez, appealing from a drug conviction, raises a single issue—whether the investigatory stop was based on reasonable suspicion? After carefully reviewing the circumstances existing at the time of the stop, we conclude that the government agents lacked information sufficient to justify the investigatory stop. Because defendant was illegally stopped, the contraband seized at the time of the stop should have been suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The failure to suppress the illegally obtained evidence requires that the conviction be reversed.

Resolution of the issue before us requires careful scrutiny of the facts, which we shall describe in detail. On the morning of February 19, 1977, William Grether, in the course of his duties as a park ranger in Big Bend National Park, received a communication from Ramos, another park employee. Ramos was suspicious of a red and white Mercury automobile, parked alongside Route 9 near the Mexican border. Ranger Grether proceeded to the area described by Ramos. When Grether arrived, approximately ten minutes later, the Mercury had moved; however, a second car, an unoccupied Cadillac, was parked on the opposite side of the road. Continuing west on Route 9, Grether located the Mercury, and followed it to a parking area at the end of Route 9. At this time the Mercury had three occupants. At the parking area, Grether responded to questions from a park visitor while watching the Mercury. The Mercury departed after five minutes, and Grether followed as it returned to the spot where it had first been observed by Ramos. Grether continued down the road as the Mercury parked across from the unmoved Cadillac.

During the surveillance of the Mercury, Grether had been in communication with Customs Officer Wynne. After the Mercury parked across from the Cadillac, the two officers, aware of only the facts mentioned above, arranged to intercept the Mercury as soon as it began moving. The two officers were to approach the area from opposite directions; the first officer to meet the Mercury was to stop it. Officer Wynne ultimately stopped the Mercury, which at that time had only two occupants. Wynne identified himself as a customs officer and requested permission to search the car. Neither of the two occupants responded. Notwithstanding the absence of consent, Wynne began to search the car, including the trunk. During this brief search, which according to Wynne lasted no more than three minutes, he detected two or three marijuana seeds on the floor of the car. Before the search had been completed, the Cadillac passed at a high rate of speed. Wynne quickly deduced that the driver of the Cadillac had been the third occupant of the Mercury, and that marijuana had originally been in the Mercury, but had been

transferred to the Cadillac. Armed with that conclusion, he immediately pursued the Cadillac. Traveling at speeds of up to fifty miles an hour on the lightly-traveled, un-graded, rocky road, the Cadillac went nine miles before being stopped by Wynne. The driver of the car was identified as the ap-pellant Resendez. Smelling marijuana on appellant's clothing, the customs officer proceeded to search the car, discovering 175 pounds of marijuana. Resendez was subse-quently charged with drug violations. Af-ter his motion to suppress was denied, Re-sendez was convicted of possessing marijua-na with the intent to distribute, a violation of 21 U.S.C. § 841(a)(1). He received a sentence of two years and a special parole term of two years.

In this appeal, our sole concern is the stop of the Cadillac, the car driven by Resendez. To evaluate the constitutionality of that stop, we must determine whether it satis-fies the standard enunciated in *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607, 618 (1975), in which roving patrols were permit-ted to "stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion   .   .   ." that the customs laws are being violated. *See United States v. Worthington*, 544 F.2d 1275 (5th Cir. 1977); *United States v. Bren-nan*, 538 F.2d 711 (5th Cir. 1976). To make this determination we look not only to the factors of which Officer Wynne had first-hand knowledge, but also to the informa-tion communicated to Wynne by Grether. *United States v. Vasquez*, 534 F.2d 1142 (5th Cir. 1976), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *Moreno-Vallejo v. United States*, 414 F.2d 901 (5th Cir. 1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970).

The government relies on the following factors to establish reasonable suspicion: (1) a Mercury with three occupants was seen near Smuggler's Crossing, an area known by the agents to be used for smug-gling, (2) the Mercury left its original posi-tion, drove to the turnaround, paused for five minutes, and returned to its original position, (3) an unoccupied Cadillac was seen parked across the road from the Mer-cury, (4) when the Mercury was stopped, it had only two occupants, and both were un-responsive, (5) Wynne observed what he thought were marijuana seeds on the floor of the Mercury, (6) while the Mercury was being searched, the Cadillac, with one occu-pant, passed at a high rate of speed, (7) the Cadillac continued down a lightly-traveled road at a speed much greater than that warranted by the condition of the road.

■    Although in *Brignoni-Ponce, supra,* the Supreme Court listed several factors relevant to inquiries such as ours, the Court also emphasized that its list was not exclu-sive and that each case turned "on the totality of the particular circumstances." 422 U.S. at 885 n.10, 95 S.Ct. at 2582, n.10, 45 L.Ed.2d 618 n.10. The cases in this circuit have identified certain factors that carry particular significance. A "vital" consideration is "whether the agents had 'reason to believe that the vehicle [in ques-tion] had come from the border.'" *United States v. Escamilla*, 560 F.2d 1229, 1231 (5th Cir. 1977); *see also United States v. Wood-ard*, 531 F.2d 741, 743 (5th Cir. 1976); *United States v. Martinez*, 526 F.2d 954, 955 (5th Cir. 1976); *United States v. DelBosque*, 523 F.2d 1251, 1252 (5th Cir. 1975). Al-though "vital," this factor is not essential, and its absence does not preclude a finding that reasonable suspicion existed at the time of the stop. *United States v. Escamil-la, supra.* Nor does a connection with the border conclusively establish the existence of reasonable suspicion; it merely permits certain "inferences to be drawn on the as-sumption that the travelers had come from the border." *United States v. Escamilla, supra,* at 1232.

■    Without doubt, a strong connec-tion with the border exists in this case. Nevertheless, we attribute that factor only slight weight. It is anomalous for the government to set aside a large tract of border property as a national park, to invite visitors to that park, and then to suggest that the mere presence of those visitors

near the border is indicative of criminal activity. In 1975, there were over 300,000 visitors at Big Bend. These persons would be surprised to learn that their visit aroused the suspicion of law enforcement authorities. Thus we conclude that in other less frequently visited regions of the border, an individual's presence would be an important factor, but within the confines of a national park, primary reliance must be on other factors.

Before it was stopped, the Mercury did nothing which could be characterized as suspicious. Although when initially sighted, the Mercury and its occupants were described as being engaged in suspicious activities, the record contains only that conclusory description. None of the specific activities underlying that conclusion are reported. After Grether's initial contact, the Mercury followed the park road to its termination, turned around, and proceeded back to its starting point. These activities are consistent with those of typical tourists. Stop and go driving with pauses of up to five minutes is exactly what tourists would be expected to do in a national park. Moreover, the return to the original location is susceptible of too many innocent interpretations to permit any inference of wrongdoing. The occupants of the Mercury may have been looking for a misplaced item; they may have been looking for friends; they may have been looking for a spot to enjoy lunch; or they may simply have been returning to a favorite area.

The location of the Cadillac, parked across from the Mercury, adds nothing to the government's case. It is not unusual to find more than one car in that area. Indeed, Ranger Grether's testimony reveals that others were in the vicinity.

The government next points to the information obtained during the stop of the Mercury: there were only two occupants; there were marijuana seeds on the floor; the occupants were unresponsive; and the Cadillac was traveling the same road. In another context, these facts might be important, perhaps even persuasive; however, here they are meaningless. Without first

establishing a connection between the two cars, the activities of the Mercury do not create any suspicion about the Cadillac. *See United States v. Barnard,* 553 F.2d 389 (5th Cir. 1977); *United States v. Macias,* 546 F.2d 58 (5th Cir. 1977); *United States v. Walker,* 522 F.2d 194 (5th Cir. 1975). At the time of the stop, the agents were totally unaware of facts establishing the requisite connection between the two vehicles. Ranger Grether testified that he saw the two vehicles parked near each other, and that he communicated everything that he saw to Officer Wynne. Officer Wynne did not recall receiving any information about the Cadillac. Because the findings of the trial court are implicitly based on a determination that Wynne was aware of the Cadillac, for purposes of this appeal we assume that the existence of the Cadillac was communicated to Officer Wynne. Nevertheless, the government has not shown that the officers were aware of any relationship, other than temporary proximity to one another. We cannot conclude that mere proximity, in a national park visited by over 300,000 persons annually, is sufficient to establish criminal complicity. Absent the connection between the two vehicles, the activities of the Mercury, the marijuana seeds, the unresponsive answers, and the passing of the Cadillac within a few minutes do not support a finding of reasonable suspicion to stop the Cadillac.

The remaining factor, and the only articulable fact relevant to the stop of the Cadillac, is the high rate of speed at which the Cadillac was traveling. When the actions of a vehicle indicate flight from law enforcement officers, this court has upheld stops based on reasonable suspicion. For example, in *United States v. Macias,* 546 F.2d 58 (5th Cir. 1977), the defendants drove to within 350 yards of a checkpoint and then executed a u-turn, driving away at high speed. This court, considering that factor in addition to the other circumstances, held that reasonable suspicion existed. Similarly, in *United States v. Estrada,* 526 F.2d 357 (5th Cir. 1976), the defendant, aware that the officers had stopped another car, engaged in activities which reasonably

appeared to be evasive. In this case, however, because the officers had not connected the two cars they could not reasonably attribute evasive intent to the driver of the Cadillac. Moreover, nothing in the record indicates that the Cadillac's rate of speed was in any way attributable to the activity of the officers. There is no evidence to indicate that the driver of the Cadillac was aware of the officers' presence in the area. There is no evidence to indicate that the driver of the Cadillac was aware that the Mercury had been stopped until he passed the officer and the Mercury. Finally, there is nothing in the record to indicate any change, either in speed or direction, by the Cadillac after it passed the stopped Mercury. In short, there is nothing in the record from which Wynne could infer an attempt by Resendez to avoid detection or evade the officers. The speed of a car, without more, does not establish reasonable suspicion that the car in question has violated the customs or immigration laws.

These cases always pose difficult questions, depending entirely on their particular facts. Often, seemingly insignificant factors tip the balance. This appeal presented a particularly close question for our determination. Had the events which transpired in Big Bend Park occurred anywhere else, a different result may have been reached. Similarly, had Ranger Grether seen one of the occupants of the Mercury enter the Cadillac, thereby clearly demonstrating the relationship between the two cars, inferences more supportive of the government's position could have been drawn. Finally, had the circumstances that initially aroused the suspicion of Ramos been fully detailed in the record, we may have been persuaded to reach a contrary result. However, none of these things were proved. Were we to uphold the stop at issue here, most of the legitimate visitors to Big Bend National Park could be subjected to such stops; those on long vacations, driving heavily loaded vehicles, would be especially suspect.

We hold that Officer Wynne did not have the requisite reasonable suspicion at the time he stopped the Cadillac. The officers acted on a generalized hunch, based primarily on the initial communication that the Mercury was engaged in suspicious activity. Because the stop was illegal, the evidence should have been suppressed. *Wong Sun, supra.* By failing to suppress the evidence, the trial court committed reversible error. Accordingly, the conviction of Eliseo Resendez is REVERSED.