[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 11, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-13803

_____

D. C. Docket No. 08-00068-CR-ORL-13KRS

UNITED STATES OF AMERICA,

                                                          Plaintiff-Appellant,

versus

JUAN BAUTISTA-SILVA,

                                                          Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 11, 2009)

Before BARKETT, PRYOR and FARRIS,* Circuit Judges.

_____

*Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

PRYOR, Circuit Judge:

This appeal presents the question whether a veteran border patrol agent, while on patrol in a marked vehicle in a corridor known for human smuggling in South Florida, reasonably suspected that a sport-utility-vehicle with California license plates containing six adult males of apparently Hispanic descent was transporting illegal aliens when the driver changed speeds erratically on a slippery road and the passengers appeared nervous and refused to acknowledge the agent's attempts to gain their attention. The district court ruled that the agent lacked reasonable suspicion to stop the vehicle, which was driven by Juan Bautista-Silva, and the district court granted Bautista-Silva's motion to suppress all statements and physical evidence obtained as a result of the stop. We conclude that the agent's decision to stop the vehicle was based on specific and articulable facts that, viewed cumulatively and in the light of the agent's extensive experience, created a reasonable suspicion of illegal activity. We reverse and remand for further proceedings.

## I. BACKGROUND

Our discussion of the background of this prosecution is divided in two parts. We first discuss the facts leading to the stop of Bautista-Silva's vehicle. We then discuss Bautista-Silva's motion to suppress all statements and physical evidence

2

obtained as a result of the stop.

*A. Facts Leading to the Stop of Bautista-Silva's Vehicle*

Senior Agent Richard Cole testified that he joined the United States Border Patrol in 1992. From 1992 to 1998, Agent Cole was stationed in Nogales, Arizona, where he "was involved with many aspects of enforcing immigration nationality law." In 1998, Agent Cole transferred to Orlando, Florida, where he continued to assist with enforcing immigration law. Agent Cole has "monitored traffic for human smuggling operations" throughout his career and has performed countless investigative stops based on "reasonable suspicion for illegal aliens or alien smuggling."

On March 20, 2008, Agent Cole and Agent Sergio Perez were monitoring southbound traffic on Interstate 95 in Brevard County, Florida, as they had done throughout the previous three years, based on intelligence provided by the Border Patrol that illegal aliens used that interstate highway to travel to South Florida. The uniformed agents were in Agent Cole's official marked vehicle, and Agent Cole was in the driver's seat of the vehicle. The vehicle was parked at a rest stop in a "very wide, open area" that allowed the agents to observe, and be observed by, southbound traffic.

Around 11:00 a.m., Agent Cole saw a silver Chevrolet Suburban that

3

contained Bautista-Silva and five passengers. As the Suburban approached the agents' location, it was "driving along with traffic," "more or less behind" a "pickup truck pulling a flat trailer with some objects in it." As the Suburban passed the agents it suddenly "seemed to get up alongside" the truck. Agent Cole observed that the Suburban had California license plates, the driver and passenger in the front of the vehicle were Hispanic adult males, and the other four passengers were also adult males. Agent Cole suspected that the Suburban contained illegal aliens and decided to pursue the Suburban to investigate.

After Agent Cole drove onto the highway, the Suburban increased its speed. As he attempted to "catch up" with the Suburban, Agent Cole observed that "it was traveling very fast because it was passing a lot of vehicles in the left lane." It took Agent Cole about "two or three minutes" to catch up with the Suburban, during which time he drove "in excess of 100 miles an hour." When Agent Cole first caught up with the Suburban, Agent Cole's vehicle was positioned behind the Suburban and both vehicles were traveling "about 90 miles an hour."

When Agent Cole "pulled up alongside" the Suburban "to get a better look," the Suburban "immediately slowed down very quickly." Agent Cole decelerated to maintain his position beside the Suburban, opened the passenger window of his vehicle, and tried to get the attention of the passengers of the Suburban. The

4

passengers appeared nervous, did not acknowledge the agents, and "just continued to look straight ahead."  Agent Cole then stopped the Suburban.  Bautista-Silva and all five of the passengers admitted they were illegal aliens from Mexico, and the agents took all six men into custody.

*B.  Bautista-Silva's Motion To Suppress All Statements and Physical Evidence Obtained as a Result of the Stop*

Bautista-Silva was charged with knowingly transporting five illegal aliens within the United States for private financial gain.  8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(1)(B)(i).  Bautista-Silva moved to dismiss the indictment or, in the alternative, to suppress all statements and physical evidence obtained as a result of the stop, on the ground that the agents lacked reasonable suspicion to stop his vehicle.  The government responded that the agents had reasonable suspicion to stop the vehicle based on their experience, specific and articulable facts, and rational inferences drawn from those facts that the vehicle contained illegal aliens.

The district court held an evidentiary hearing, at which Agent Cole testified on behalf of the government, and Bautista-Silva presented the testimony of a defense investigator.  Agent Cole testified that his decision to stop Bautista-Silva's vehicle was based on several factors that, in his experience, suggested the vehicle contained illegal aliens: (1) the Suburban was the kind of large vehicle often used by smugglers to transport illegal aliens; (2) the driver and all five passengers were

5

Hispanic adult males; (3) the Suburban was registered in California, a known staging area for human smuggling; (4) the Suburban was traveling south on I-95, a route known to be used by smugglers to transport aliens to South Florida; (5) as it passed Agent Cole's parked patrol vehicle, the Suburban appeared to hide behind another vehicle in an attempt to avoid detection; (6) Bautista-Silva drove erratically on a slippery road after passing Agent Cole, when he first accelerated in an apparent attempt to evade the agents and decelerated immediately after Agent Cole caught up in an apparent attempt to let the agents pass; and (7) the passengers of the Suburban appeared nervous, stared straight ahead, and refused to acknowledge Agent Cole's attempt to gain their attention.

On cross-examination, Agent Cole testified that he was familiar with the Treasury Enforcement Communications System, a computer database of information about vehicles that cross the border of the United States, but he did not check that system for information about Bautista-Silva's vehicle. Agent Cole acknowledged that several of the factors on which he based his decision to stop Bautista-Silva's vehicle were susceptible of innocent explanation: (1) it was not unusual on that portion of I-95 to see large vehicles, vehicles with California license plates, or vehicles with multiple Hispanic passengers; (2) it was not unusual, in the morning, to "see people going to and from work with many males

6

in the car"; and (3) I-95 is a "heavily traveled road[.]" Agent Cole also testified that nothing about the Suburban itself made the vehicle appear suspicious or overloaded.

The district court ruled that the agents lacked reasonable suspicion to stop Bautista-Silva's vehicle. The district court credited Agent Cole's testimony about the events but concluded that most of the factors on which Agent Cole based his decision to stop Bautista-Silva's vehicle were "too commonplace to support [reasonable suspicion] or to be given meaningful weight in a 'totality of the circumstances' analysis." According to the district court, it was of "some relevance" that Bautista-Silva's vehicle was large, was traveling south on I-95, had California license plates, and contained passengers that appeared to be Hispanic, but the district court found that those facts were insufficient to justify the stop. The district court also found that it "would not be proper to assign much weight" to the type of vehicle that Bautista-Silva was driving because "agents are hardly unanimous in their belief that vehicles such as SUVs, trucks and vans are the vehicles of choice for those engaged in smuggling of aliens." The court weighed against the factors relied on by Agent Cole the lack of proximity of the Suburban to the Mexican border, the normal appearance of the Suburban, Agent Cole's failure to describe the passengers of the Suburban as "distinctively Mexican," and

7

that "the agents were not aware of any other reasons to suspect this particular vehicle, such as an anonymous tip that it was transporting aliens or a report from other agents that it had recently been observed in an area known for illegal border crossings."

The district court concluded that "[t]he legality of the stop . . . primarily rests on two factors: the behavior of the vehicle, and the behavior of its occupants." The district court concluded that neither of these factors could create a reasonable suspicion of illegal activity. The district court opined that "the driving behavior of the Suburban was not remarkable" because Agent Cole "was not certain that the Suburban was attempting to avoid his notice as it first approached him[.]" The district court also opined that Bautista-Silva's acceleration and deceleration were "not sufficiently different from the way others routinely drive on Interstate 95 to warrant suspicion." According to the court, Agent Cole's suspicion that Bautista-Silva accelerated after passing his parked patrol vehicle to evade the agents was undermined by the fact that there was no evidence that Bautista-Silva attempted to exit the highway, despite the availability of an off-ramp after Bautista-Silva passed Agent Cole and before Agent Cole caught up to him.

The district court ruled that the behavior of the passengers of the Suburban could not be considered in determining whether the agents had reasonable

8

suspicion to stop the vehicle because "actions of a defendant in staring straight ahead 'cannot weigh in the balance in any way whatsoever[.]'" The district court denied Bautista-Silva's motion to dismiss the indictment but granted Bautista-Silva's motion to suppress all statements and physical evidence obtained as a result of the stop. This interlocutory appeal by the government followed.

## II. STANDARDS OF REVIEW

A motion to suppress is a mixed question of law and fact. We review the factual findings of the district court for clear error and the application of law to those facts de novo. United States v. Mercer, 541 F.3d 1070, 1073–74 (11th Cir. 2008) (per curiam). Because Bautista-Silva prevailed in the district court, we construe the facts in the light most favorable to him. Id. at 1074. Whether there was reasonable suspicion to justify the stop is a question of law that we review de novo. Hicks v. Moore, 422 F.3d 1246, 1252 (11th Cir. 2005).

## III. DISCUSSION

The government argues that the district court erred when it ruled that the agents lacked reasonable suspicion to stop Bautista-Silva's vehicle because Agent Cole's decision to stop the vehicle was based on specific and articulable facts that, viewed cumulatively and in the light of Agent Cole's extensive experience, created a reasonable suspicion that the vehicle contained illegal aliens. The government

9

argues that the district court erred because, although the court acknowledged its duty to consider the totality of the circumstances, the court "analyzed the facts in isolation, strained to find innocent explanations for those facts, and failed to view those facts through the eyes of an experienced Border Patrol agent." We agree. The record establishes that Agent Cole reasonably suspected that Bautista-Silva's vehicle contained illegal aliens.

"[W]hen an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S. Ct. 2574, 2580 (1975). Although "[t]he reasonable suspicion must be more than an inchoate and unparticularized suspicion or hunch," United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (internal quotation marks omitted), "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002). The officer's reasonable suspicion must be based on "specific articulable facts, together with rational inferences from those facts." Brignoni-Ponce, 422 U.S. at 884, 95 S. Ct. at 2582.

To determine whether Agent Cole had reasonable suspicion to stop Bautista-Silva's vehicle, we "must look at the totality of the circumstances . . . to see whether the [agent] ha[d] a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273, 122 S. Ct. at 750 (internal quotation marks omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 273, 122 S. Ct. at 750–51 (internal quotation marks omitted). We may not consider each fact only in isolation, and reasonable suspicion may exist even if each fact "alone is susceptible of innocent explanation." Id. at 277–78, 122 S. Ct. at 753.

The Supreme Court has held that many of the factors that led Agent Cole to stop Bautista-Silva's vehicle "may be taken into account in deciding whether there is reasonable suspicion to stop a [vehicle]." Brignoni-Ponce, 422 U.S. at 884, 95 S. Ct. at 2582. In Brignoni-Ponce, the Court provided a nonexhaustive list of some of the factors that "[o]fficers may consider": (1) "the characteristics of the area in which" the vehicle is encountered; (2) the proximity of the vehicle to the border; (3) "the usual patterns of traffic on the particular road"; (4) an agent's "previous experience with alien traffic"; (5) "information about recent illegal border

11

crossings in the area"; (6) "[t]he driver's behavior"; (7) and "[a]spects of the vehicle itself." Id. at 884–85, 95 S. Ct. at 2582. The Court also stated that "the apparent Mexican ancestry of the occupants" of a vehicle is a relevant factor, but that this factor alone does not justify stopping a vehicle. Id. at 885–87, 95 S. Ct. at 2582–83.

Agent Cole's decision to stop Bautista-Silva's vehicle was based on "specific articulable facts, together with rational inferences from those facts, that reasonably warrant[ed]" Agent Cole's suspicion that the vehicle contained illegal aliens. Id. at 884, 95 S. Ct. at 2582. Agent Cole testified that his decision to stop Bautista-Silva's vehicle was based on seven factors that, in his experience, caused him to suspect the vehicle contained illegal aliens. These factors, "[t]aken together . . . sufficed to form a particularized and objective basis for . . . stopping [Bautista-Silva's] vehicle, making the stop reasonable within the meaning of the Fourth Amendment." Arvizu, 534 U.S. at 277–78, 122 S. Ct. at 753.

Although the district court stated that the factors on which Agent Cole based his decision to stop the vehicle did not create a reasonable suspicion of illegal activity "even when added together," the district court erroneously reviewed those factors in isolation and rejected most of the factors because each factor was susceptible of innocent explanation. The Supreme Court has rejected this kind of

12

"divide-and-conquer analysis" and made clear that reasonable suspicion may exist even if each fact "alone is susceptible of innocent explanation." See id. at 273–78, 122 S. Ct. at 750–53. The correct approach examines the "totality of the circumstances." Id. at 273, 122 S. Ct. at 750.

The district court erred when it concluded that "it would not be proper to assign much weight" to the kind of vehicle that Bautista-Silva was driving because "agents are hardly unanimous in their belief that vehicles such as SUVs, trucks and vans are the vehicles of choice for those engaged in smuggling of aliens." This approach does not allow agents "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 273, 122 S. Ct. at 750–51 (internal quotation marks omitted). Our objective inquiry concerns Agent Cole's experiences based on his testimony, not the purported experiences of other agents who did not testify about the kinds of vehicles used to smuggle illegal aliens.

The district court also erred when it opined that Bautista-Silva's driving behavior, both as he passed Agent Cole's patrol vehicle and afterwards, did not create a reasonable suspicion of illegal activity. The court stated that Bautista-Silva's conduct as he passed the patrol vehicle "was not remarkable" because

13

"[Agent] Cole himself was not certain that the Suburban was attempting to avoid his notice as it first approached him; at most he thought it might have been, in his words, 'drifting' behind the pickup truck." The district court erred because reasonable suspicion does not require absolute certainty. See id. at 274, 122 S. Ct. at 751; Powell, 222 F.3d at 917. This movement of the Suburban was a suspicious and relevant factor. The dissent argues that we erroneously construe Agent Cole's testimony about Bautista-Silva's passing of the patrol vehicle in favor of the government, but we disagree. We instead determine whether Agent Cole's testimony, which the district court credited, supports the decision to stop Bautista-Silva's vehicle as based on a reasonable suspicion of illegal activity.

The district court confused the issue of Bautista-Silva's erratic driving by giving weight to a red herring about whether Bautista-Silva left the highway at the first available exit. Although the district court determined that Bautista-Silva's conduct after he passed the patrol vehicle was "the agents' most significant observation," the district court remarkably opined that "the Suburban's acceleration and deceleration – unaccompanied by any attempt to exit the highway or take other obviously evasive action – was not sufficiently different from the way others routinely drive on Interstate 95 to warrant suspicion." Agent Cole testified that Bautista-Silva's sudden acceleration to approximately 90 miles per hour after

14

passing the agents was suspicious because, in his experience, when alien smugglers realize they have been noticed by the Border Patrol, they often attempt to evade pursuit. We disagree with the conjecture of the district court that Bautista-Silva's failure to avail himself of the first available exit off the highway after he accelerated renders Agent Cole's suspicion about Bautista-Silva's erratic driving unreasonable. Bautista-Silva's acceleration to 90 miles an hour on an interstate highway in advance of a marked patrol car was suspicious, if for no other reason, because it was illegal. Agent Cole also testified that Bautista-Silva's abrupt deceleration after the agents caught up to his vehicle was suspicious because, in Agent Cole's experience, smugglers will often decelerate to allow Border Patrol agents to pass. Agent Cole also testified that Bautista-Silva's rapid acceleration and deceleration concerned him because "[t]he road was slippery[,]" as it had been "raining off and on that day."

We disagree with the district court that there is a "'heads I win, tails you lose' flavor to basing a 'reasonable suspicion' on [Bautista-Silva's driving behavior]." Agent Cole reasonably suspected that Bautista-Silva first attempted to escape by accelerating and then, when the escape attempt proved unsuccessful, decelerated to allow the agents to pass. Bautista-Silva's erratic driving behavior on a slippery road supported Agent Cole's reasonable suspicion that the vehicle

15

contained illegal aliens.

The district court also cited United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir. 1977), for the proposition that "actions of a defendant in staring straight ahead 'cannot weigh in the balance in any way whatsoever'[,]" but there are two problems with that proposition. First, the facts of Escamilla are distinguishable. In Escamilla, the drivers of two different vehicles looked straight ahead as their respective vehicles proceeded through an intersection, and both drivers failed to acknowledge the presence of a marked patrol car parked at the intersection. 560 F.2d at 1230. In contrast, in this appeal five passengers of a vehicle appeared nervous, "continued to look straight ahead," and ignored Agent Cole's obvious and repeated attempts to attract their attention. Second, the reasoning of the district court conflicts with the more recent approach required by the Supreme Court. In Arvizu, the Court made clear that it has "deliberately avoided reducing [the concept of reasonable suspicion] to a neat set of legal rules," and rejected the attempt by the Ninth Circuit "clearly [to] delimit an officer's consideration of certain factors." 534 U.S. at 274–75, 122 S. Ct. at 751 (internal quotation marks omitted). The Court stated that "a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance . . . while quite unusual in another," and a detaining

16

officer is "entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants." Id. at 275–76, 122 S. Ct. at 752. We must consider the behavior of the passengers of the vehicle, and that behavior, along with the totality of the circumstances that existed when the agents stopped Bautista-Silva's vehicle, created a reasonable suspicion that the vehicle contained illegal aliens.

## IV. CONCLUSION

We **REVERSE** the order that granted Bautista-Silva's motion to suppress, and we **REMAND** for further proceedings consistent with this opinion.

BARKETT, Circuit Judge, dissenting:

I believe that the district court was eminently correct in finding that the totality of the meager facts presented in this case do not total <u>reasonable</u> suspicion, and the district court's conclusions are entitled to our deference.

The Fourth Amendment was designed to protect the rights of people against unreasonable searches and seizures. As our jurisprudence has evolved, so have our standards for judging what constitutes reasonable grounds for stopping our citizens. Such changes, however, have not eviscerated the protections of the Fourth Amendment entirely, and law enforcement officers are still required to justify their stops and searches with a <u>reasonable, articulable</u> suspicion based on <u>objective facts</u> that <u>criminal activity either has occurred, or is likely to occur</u>. Suspicion that is not reasonable or cannot be supported by an articulation that logically connects action to criminal activity, is simply a hunch and does not permit a seizure. "The reasonable suspicion must be more than an inchoate and unparticularized suspicion or hunch." <u>United States v. Powell</u>, 222 F.3d 913, 917 (11th Cir. 2000) (quotation marks and citation omitted).

The testimony of the agent in this case, Agent Cole, may support a hunch, but no facts were articulated that turned that hunch into a <u>reasonable</u> conclusion

18

that the activity was related to a criminal act.[1]  The Fourth Amendment is supposed

to protect citizens in a free society from being seized by the government at random

when their behavior appears completely law-abiding.  Indeed, the Supreme Court

has said that "the Fourth Amendment forbids stopping vehicles at random to

inquire if they are carrying aliens who are illegally in the country, [and] it also

forbids stopping or detaining persons for questioning about their citizenship on less

than a reasonable suspicion that they may be aliens." United States v. Brignoni-

Ponce, 422 U.S. 873, 884 (1975) (emphasis added).

In this case the majority sees the testimony presented differently than I do,

and more importantly, than the district court did.  Although in noting the standard

of review the majority appropriately recites our responsibility to view the facts in

the light most favorable to Bautista-Silva, it remarkably does not do so.  Rather, it

presents the facts in the light most favorable to the government, cobbling together

select portions of the testimony to support  its  own conclusion.

Agent Cole testified on direct examination to the following: He was

monitoring southbound traffic on Interstate 95 ("I-95")  from a highway rest area

near Orlando, Florida, when he saw a Suburban pass.  From the rest area, he

---

[1] The majority opinion states that the district court "credited" Agent Cole's testimony.  The district court did not say that, and I believe, if anything, the skepticism expressed in the district court's order over the lack of a reasonable suspicion suggests the opposite.

19

watched [the Suburban] pass [his]location. He testified that "As it was passing where I was sitting, it was in the outside lane, closer to the median — there's two lanes — and in front of it or in between me, myself, and that vehicle was a pickup truck pulling a flat trailer with some objects in it. And I saw the vehicle go by and I noticed that there were six occupants in the car in the vehicle; and after they passed my location . . . I saw that it had a license plate from California." In addition, Agent Cole said he noticed that the car contained all male subjects and that he "knew [the two people in the front seats] were Hispanic males." At this point he told his partner "there was a smuggling load" and he left the rest area to catch the Suburban.

Agent Cole admitted that he did not know how fast the Suburban was going when it originally passed the rest area from which he was observing traffic. Nor did he suggest that the Suburban being driven erratically, but rather simply appeared to be driving along with traffic. Nonetheless, he acknowledged on cross examination that "[b]ased solely on the fact that it was a California license plate, a Chevy suburban with at least two, if not six, Hispanic males in it," he had already determined that this "was an alien smuggling case."

Moreover, even when accounting for the events that occurred prior to Agent Cole's stop of the vehicle, I still find an insufficient basis for reasonable suspicion.

20

Agent Cole testified that he did not "immediately pull out [of his position in the rest area] because there's a ravine there and I did not want to get stuck in the mud. So I had to actually go behind and go down parallel to him as I drove out the rest area onto the highway." When Agent Cole sped up to approximately ninety miles an hour to catch the Suburban, it "slowed down very quickly." Agent Cole testified that he lowered his window and waved from the driver's seat to get the attention of the occupants, to which they apparently failed to respond. He then stopped the Suburban.

These few facts, considered in their totality, fall short of supporting the conclusion that "reasonable suspicion objectively existed to justify" Agent Cole's decision to conduct a stop. Hicks v. Moore, 422 F.3d 1246, 1252 (11th Cir. 2005) (citing Evans v. Stephens, 407 F.3d 1272, 1280 n.9 (11th Cir. 2005) (en banc)). As the district court correctly concluded "almost all of the facts relied upon by the Border Patrol agents in initiating this stop — such as the size of the vehicle, and out-of-state license plates, the location, etc. — were entirely (or almost entirely) neutral, and even when added together did not tend to suggest that the Suburban was engaged in illegal activity." Also noted by the district court, "most [of the factors relied upon by Agent Cole] are too commonplace to support such a suspicion or to be given meaningful weight in a 'totality of the circumstances'

21

analysis."

The majority disagrees but misapplies the law in doing so. For example, in attempting to discount the district court's conclusion and to justify its own, the majority improperly construes against Bautista-Silva, Agent Cole's testimony regarding the circumstances regarding the Suburban and pickup truck's passing of the rest area. Agent Cole stated that the Suburban might have been at most "drifting" behind the pickup truck, and that he was uncertain if it was attempting to avoid his detection. However, rather than construe this testimony in favor of Bautista-Silva, the majority finds that the Suburban's movement by the pickup truck was "suspicious," — a finding unsupported by the record evidence.

The truck that the Suburban was supposedly using to cloak itself was merely a pickup truck pulling a flat trailer, not an eighteen-wheeler or other oversize vehicle that would have hidden the Suburban from view. The Suburban and the pickup truck could only have been viewed by the border patrol agents for a few seconds as they passed the rest area. There was no indication that the drivers or passengers in either vehicle saw the border patrol agents. Nor did Agent Cole offer any facts whatsoever describing any maneuvers to "hide" or otherwise to support his bare conclusions that Bautista-Silva might have been trying to evade detection. Most tellingly, Agent Cole never mentioned in his police report filed at the time of

22

this incident that the Suburban made any attempt to hide behind the pickup truck as it passed the rest area. Viewing these facts in the light most favorable to Bautista-Silva simply does not support the conclusion that the Suburban was doing anything other than traveling along the highway.

Given these unremarkable facts, I find no basis to disturb the district court's findings that: (1) the fact that the Suburban was traveling south on I-95 was unremarkable because millions of vehicles use the I-95 corridor, and there was no evidence that smugglers used I-95 disproportionately or that it was a "hot spot" for smuggling; (2) the fact that the Suburban had a California license plate was unremarkable because hundreds of thousands of visitors come to Florida from California every year; (3) the fact that the vehicle was a Suburban was unremarkable because border patrol agents are not unanimous in their belief that SUVs are the vehicles of choice among smugglers and there are an overwhelming number of law abiding citizens traveling on I-95 in SUVs; (4) the Suburban's speeding up and slowing down was unremarkable because "this was not sufficiently different from the way others routinely drive on Interstate 95 to warrant suspicion," especially given that the Suburban never attempted to escape by exiting the highway; and (5) under prior Fifth Circuit precedent, the fact that the defendants stared straight ahead and did not acknowledge Agent Cole's marked car

23

could not be assigned any weight in assessing the constitutionality of a stop, especially as there was no evidence that Bautista-Silva even saw Agent Cole's border patrol car.[2]

Moreover, under our precedent, the district court's conclusions are further supported by the lack of facts underlying Agent Cole's asserted expertise. As an en banc court, in United States v. Frazier, 387 F.3d 1244 (11th Cir. 2004), we said: "[s]ince [the expert] was relying solely or primarily on his experience, it remained [his] burden . . . to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." Id. at 1265 (emphasis added). Agent Cole's suppression hearing testimony, in contrast, was highly generalized and failed to sufficiently tether his experience to the relevant facts. For example, although he claimed to have stopped many vehicles on I-95, there was no evidence of how many, if any, of those stops turned out to involve illegal

---

[2]  Unlike the majority, I do not find that the district court's reliance on prior Fifth Circuit precedent, United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir. 1977), is without merit despite the Supreme Court's observations in United States v. Arvizu, 534 U.S. 266 (2002).  In Arvizu the Court remarked that "a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona)," and that an officer is entitled to assess that situation.  534 U.S. at 275-76 (emphasis added).  Here, however, there is no evidence that anyone in the Suburban had spotted the border patrol agent.  Moreover, the Suburban's presence on southbound I-95 through Orlando, Florida is much more similar to a busy San Francisco highway than it is to a remote portion of rural Arizona.  I-95 is a heavily traveled highway in Florida and Orlando is one of the major metropolitan areas in Florida.

24

aliens.

The district court further acknowledged Florida's lack of proximity to the Mexican border, which weighs against the government, and the record was devoid of evidence that the Suburban was overloaded or that the passengers attempted to conceal themselves. It is also worth noting that the presence of Hispanics in Florida can hardly be deemed uncommon, or indicative of anything suspicious or illegal. Finally, the district court noted that Agent Cole and his partner, Agent Perez, failed to check the Treasury Enforcement Communications System to see if the Suburban was associated with human smuggling.

Our deference is to the district court's factual findings. The majority is correct that the threshold for reasonable suspicion justifying an investigatory stop is lower than the threshold for probable cause justifying an arrest. However, to permit the stop under these facts is to permit mere hunches to legitimize stops, not reasonable suspicion. The district court correctly determined that the circumstances that led Agent Cole to conclude at the rest stop that there was reasonable suspicion that the Suburban contained illegal aliens could not objectively support a "particularized and objective basis" for suspecting any illegal activity. All that Agent Cole knew when he decided that this "was an alien smuggling case" and proceeded to stop the vehicle, was that a Suburban with

25

California license plates and possibly all male passengers, including two Hispanics, was traveling on I-95 through Florida, alongside a pickup truck as it passed the rest area — all sufficiently unremarkable events even when considered in conjunction with each other. These factors, even when viewed together, support nothing more than impermissible racial profiling that should never be used under our Constitution as an excuse for randomly stopping any of the many Hispanic motorists that travel the highways of Florida in SUV's. I respectfully dissent.