**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Brian Dennis BARNARD,**
**Defendant-Appellant.**

No. 76–3003.

United States Court of Appeals,
Fifth Circuit.

May 31, 1977.

Rehearing and Rehearing En Banc
Denied Aug. 22, 1977.

---

Daniel V. Alfaro, Albert R. Huerta, Corpus Christi, Tex., for defendant-appellant.

Edward B. McDonough, Jr., U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Rene J. Gonzalez, James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before SIMPSON, GEE and HILL, Circuit Judges.

GEE, Circuit Judge:

For his alleged role in transporting marijuana away from the Texas-Mexico border, Brian Dennis Barnard was convicted in a nonjury trial of conspiracy to possess and possession of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1) (1970). He received on each count a three-year sentence with a two-year special parole term, the sentences to run concurrently. Finding as we do that the search during which the contraband was discovered was constitutionally permissible and that sufficient evidence in the record supports the conviction, we affirm.

While tracking illegal aliens on Texas Farm Road 649 near its intersection with Farm Road 2686 some 20 miles north of the

Rio Grande on the morning of January 19, 1976, Border Patrol Officer Webster Ozuna was passed by two automobiles proceeding north on 649 about a mile apart. Officer Ozuna had been in the area for about half an hour, and the two cars were the first he had seen. First to pass him was an MG sports car with two occupants and a citizen's band (CB) radio antenna; the driver appeared to be talking into a microphone as the MG passed. Following at a distance of about one mile was a white Mercury which, like the MG, carried a CB antenna. Officer Ozuna noticed that the license plates on the Mercury included the same three-letter prefix, FBU, as the MG's license plates, indicating that both automobiles were registered in the same county and in one other than Starr County, through which they were driving.[1] Further, the driver and sole occupant of the Mercury appeared nervous, looking repeatedly at the officer, and the rear end of the car appeared to be riding low. Suspecting that the trunk of the Mercury might contain illegal aliens, Officer Ozuna got in his jeep and began following it. He testified that the Mercury was driven erratically, at speeds ranging from 35 to 60 miles per hour, and that the MG, in view up ahead on the straight road, varied its speed to maintain a constant distance between it and the Mercury. After following for 10 or 15 miles, Officer Ozuna stopped the Mercury and watched the MG accelerate out of sight.

Meeting the driver, Crabb,[2] at the rear bumper of the Mercury, Ozuna smelled the odor of marijuana and asked for a trunk key. Crabb replied that he did not own the car and did not have a trunk key. Glancing inside the Mercury, Ozuna saw on the key ring a round-headed key and asked Crabb to use it to open the trunk. Crabb instead gave the keys to Ozuna, who then opened the trunk and found 84 pounds of marijuana in kilo bricks. Ozuna arrested Crabb and radioed ahead for other officers to stop the MG, giving a description and the license prefix. About 20 miles north and a half hour later, the MG was stopped; officers learned the identity of the driver, appellant Barnard, and passenger, Walters,[3] and then allowed them to proceed.

## I. *Legality of the Stop and Search.*

After the initial stop of the Mercury, the odor of marijuana emanating from the trunk furnished probable cause for the search of the trunk. *United States v. Diaz*, 541 F.2d 1165, 1166 (5th Cir. 1976); *United States v. Coffey*, 520 F.2d 1103, 1104 (5th Cir. 1975). Appellant's complaint, then, is directed at the initial stop of the Mercury and the subsequent stop of the MG. Officer Ozuna's actions effectively constituted him a roving patrol near the border; his stop of the Mercury for questioning of its driver was thus constitutionally permissible only if his observations might have led him reasonably to suspect that the Mercury contained illegal aliens. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2480, 45 L.Ed.2d 607, 617 (1975). The "reasonable suspicion" determination may be the sum of a number of factors, including: characteristics of the area, including its proximity to the border; the usual traffic patterns on the road; previous experience with alien smuggling and information about recent border crossings in the vicinity; the behavior of the driver, such as erratic driving; and characteristics of the vehicle, including the appearance of being heavily loaded. *Id.* at 884–85, 95 S.Ct. at 2582, 45 L.Ed.2d at 618–19.

Several of the *Brignoni-Ponce* factors were, indeed, present when Officer Ozuna stopped the Mercury. It appeared, for example, to be heavily loaded, as it would be if aliens were concealed in the trunk. *See United States v. Lara*, 517 F.2d 209, 210 (5th Cir. 1975). Its driver glanced repeatedly and nervously at Ozuna as he

---

1. In fact, a title search revealed that both vehicles were registered in Aransas County, Texas, about 140 air miles from the Starr County location where Officer Ozuna first saw the two cars.

2. Crabb was convicted on his guilty plea.

3. Walters, like Crabb, pleaded guilty and received a probated sentence.

passed and then drove erratically while Ozuna followed. The Mercury was from another county and was traveling northward in a border area not known for tourist or business activities. We might uphold the stop of the Mercury on these facts alone, but we need not, since Ozuna was entitled to and did consider the implications of the manner in which the two vehicles were traveling together. On the basis of his four years of experience as a border patrolman in the area, Ozuna inferred that the MG might be a "lead car" or "scout car" and the Mercury a "load car" carrying aliens. The Ninth Circuit particularly has taken note of this " 'lead car-load car' modus operandi, whereby two cars travel together during a smuggling venture with the first car operating primarily as a scout car." *United States v. Vital-Padilla*, 500 F.2d 641, 643 (9th Cir. 1974); *United States v. Portillo*, 469 F.2d 907, 909–10 (9th Cir. 1972); *United States v. Figueroa-Espinoza*, 454 F.2d 590, 591 (9th Cir. 1972); *United States v. Baca*, 368 F.Supp. 398 (S.D.Cal.1973).[4] Although observation of two cars in proximity on a sparsely traveled road does not itself justify a stop, it may understandably raise the officer's suspicions. *United States v. Larios-Montes*, 500 F.2d 941, 943 (9th Cir. 1974).[5] Further tending to connect the two cars here was the existence on each of a CB antenna and a visible microphone, the use of which would indicate the presence of some type of electronic device, in the MG.[6] The identical three-letter license prefixes indicating that the vehicles—and perforce their occupants—were from the same coun-

ty and not residents of this locale further suggested that, absent some real coincidence, the two cars *must* have been traveling together in this sparsely populated and densely vegetated area. Finally, given the limited range of CB radios and the fact that these were the only two vehicles Ozuna had seen on one of the few roads in the area, he could suspect strongly that if the MG driver were indeed talking into a CB rig he probably was communicating with the driver of the following Mercury with the CB antenna. In sum, Officer Ozuna's suspicion that aliens were being smuggled was reasonable and the stop justified; probable cause for the search being furnished by the odor of marijuana, appellant's motion to suppress the seized contraband was properly denied.

■ The subsequent stop of the MG, enabling the officers to ascertain the identities of Barnard and Walters, was likewise constitutionally valid. When Officer Ozuna discovered marijuana in the Mercury, he knew that a crime had been committed and had reasonable cause, given his observations and his knowledge of the "lead car-load car" technique, to believe that the occupants of the MG were involved in its commission. *United States v. Vital-Padilla*, 500 F.2d 641, 644 (9th Cir. 1974). An arrest would have been justified; certainly the brief stop to learn names was no less proper.

II. *Sufficiency of the Evidence.*

■ Since Barnard received concurrent sentences on the conspiracy and possession count, our inquiry into the sufficiency of

---

**4.** A scout car containing no aliens or contraband may, for example, be used to locate temporary border checkpoints which are open and operating and in some way—as by the use of CB radio—alert the load car to change course or turn back.

**5.** "The fact that the first car to appear in the area in forty minutes was followed fairly closely by a second car could reasonably be expected to trigger the officers' suspicion of the lead car-load car modus operandi." *Id.*

On the other hand, it would be improper to infer that the lead car-load car scheme was being used when the purported scout car was actually following, rather than preceding, the

load car. *United States v. Barragan-Martinez*, 504 F.2d 1155, 1157 (9th Cir. 1974).

**6.** Absent connecting factors such as the CB antennas or similar license plates, the proximity of the automobiles might seem ambiguous, since some distance—here a mile—must be maintained if the lead car is to be of any use in alerting the load car of checkpoints and patrols. It is said that two-way radios greatly facilitate the two-car technique by allowing lead and load cars to keep an adequate distance apart and yet remain in communication. *See* TEXAS MONTHLY, April 1977, at 86–87 (discussing CB radio usage in Starr County marijuana convoys).

the evidence ends when we find that one of the convictions is supported by evidence in the record. *Mishan v. United States*, 345 F.2d 790, 791 (5th Cir. 1965). Considering the evidence in the light most favorable to the government, as we must, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we find that sufficient credible evidence does support Barnard's conviction on the conspiracy count, and thus do not consider his conviction for possession.

We have already noted several of the officer's observations which tended to connect the two vehicles in an apparent concerted effort to smuggle some form of contraband, human or otherwise, and thus to justify the stops of the vehicles; the court below in evaluating the proof was entitled to consider these as bearing on Barnard's potential guilt. It also could consider the amount of marijuana seized—84 pounds, which, although not an outsized load for the area,[7] is enough to justify the inference that more than one person must be involved in moving it toward its ultimate dispersal. But the weightiest evidence of Barnard's involvement surfaced after the stop of the MG. Barnard was driving the MG, and his passenger, Walters, was the son of the owner of the Mercury. A subsequent search of the Mercury produced evidence further tending to connect both Walters and Barnard with it. In the Mercury's glove compartment was found Walters' wallet, containing his driver's license and some business cards in his name. A shaving kit carrying the inscription "C. E. Barnard" was in the front seat, and hanging in the back seat was a sweater with a laundry tag marked "E. Barnard." Granting that appellant's given names abbreviate to "B. D." rather than "C. E.," the court was nevertheless permitted to find some evidence tying Barnard to the load car from the presence therein of the sweater and shaving kit because of the coincidence of the last names.

The record, then, contains ample evidence to support the trial court's determination, first, that a conspiracy existed, and second, that Barnard was an active, knowing participant. First, the totality of the evidence certainly leaves the impression of "a concert of action, all parties working together understandingly, with a single design . . . ," *United States v. Prout*, 526 F.2d 380, 385 (5th Cir. 1976); the trier of fact certainly could draw, from the circumstantial proof, the reasonable inference of an agreement. *United States v. Gomez*, 529 F.2d 412, 418 (5th Cir. 1976). We have discussed at length the circumstantial evidence which establishes that Barnard was connected with the conspiring group or, at least, "acting in such a manner as unmistakably to forward its purpose," *United States v. Alvarez*, 548 F.2d 342, 344 (5th Cir. 1977); the slight additional evidence required to show that his participation was *knowing, id.* may be found in several particulars. Barnard's conduct clearly conformed to the lead car-load car modus operandi common to smuggling in border areas; on similar facts the Ninth Circuit has found ample evidence to support the conspiracy convictions of the driver of the lead vehicle and his passenger, who was the owner of the load car which carried illegal aliens, in the absence of any other incriminating evidence. *United States v. Vital-Padilla*, 500 F.2d 641, 645 (9th Cir. 1974). Although it is conceivable and might be argued that Barnard could simply have been a tourist whose friends picked up illicit cargo unbeknownst to him before heading back home, the fact that the three men were traveling in two cars when the Mercury would have carried them all swings the pendulum back toward guilty knowledge on the part of all, including Barnard. Finally, Officer Ozuna testified that the MG sped up when he stopped the Mercury, rather than returning to aid a traveling companion; and it was Barnard who was driving when the MG was stopped a short time later. The evidence supports the trial court's finding that Barnard's association with the conspiring group was knowledgeable and that he acted in furtherance of its aims. His conviction is therefore

AFFIRMED.

---

7. *See, e. g., United States v. Alvarez*, 548 F.2d 542 (5th Cir. 1977) (1,600 pounds).