# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

---

m 99-50556

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JOSÉ ANGEL MENDOZA,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Texas

---

August 29, 2000

Before JOLLY, SMITH, and BARKSDALE,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

José Mendoza challenges the sufficiency of the evidence supporting his convictions of conspiracy to possess marihuana with intent to distribute, in violation of 21 U.S.C. § 846, and possession of marihuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). We affirm.

I.

Border Patrol Agent Andrew Graham spotted a Nissan Maxima traveling northbound on Highway 118 approximately thirty-five miles south of Alpine, Texas; about one mile behind was a Ford Thunderbird with two occupants. Because the occupants of the Thunderbird appeared surprised when he passed, Graham turned around to follow the vehicle. The Thunderbird braked and swerved to the side of the road, then slowed its speed; the Maxima continued northbound toward the Border Patrol checkpoint located about fifteen miles south of Alpine.

Graham continued to follow the Thunderbird, which pulled into a rest area approximately two miles south of the checkpoint, whereupon the driver and passenger exited and paced nervously around the front of the vehicle, then a minute or two later returned to their car and continued traveling northbound. A small distance south of the checkpoint, Graham passed the Thunderbird to arrive at the checkpoint first.

The Maxima reached the checkpoint before Graham. Mendoza was driving, and his girlfriend, Hermila Salazar-Benavidez ("Salazar") was in the passenger's seat. After advising Agent Frank Lopez that they were United States citizens returning from Mexico, they were directed to a secondary inspection, at which Mendoza consented to a canine search of the car.

The dog alerted to the trunk area. In the trunk, Lopez found what he believed to be a marihuana "twig," but a field test came back negative. Lopez testified that, based on his experience and the dog's alerting aggressively on the car, he was certain that the twig was marihuana residue but that the quantity was too small to yield a positive test result. Lopez searched for a hidden compartment but found none.

When the Thunderbird reached the checkpoint, Graham asked the occupants about their immigration status. The male driver, Ambrocio Gomez, appeared nervous, and the female passenger, Modesta Martinez, avoided eye contact. When asked whether he had been traveling with the Maxima, Gomez responded in the negative. A canine search of the Thunderbird uncovered several hidden bundles of marihuana totaling 119.34 pounds, and Gomez and Martinez were arrested.

Graham believed that the Maxima and Thunderbird had been traveling as a "lead-car/load-car" team, the "lead car" being used to scout ahead of the "load car" carrying the contraband. Lopez and Agent Neal Thames agreed that the circumstances were suspicious. When Thames asked Mendoza and Salazar whether they knew the occupants of the Thunderbird, they responded in the negative.

Thames collected driver's licenses from Mendoza, Salazar, Gomez, and Martinez, and compared them. He noticed that Salazar and Martinez (the passengers) lived in the same city and that Mendoza and Gomez (the drivers) lived in adjacent towns a few miles apart. Graham found a receipt in the Thunderbird signed by "Hermila Hernandez." After comparing the signature on the receipt with the one on Salazar's driver's license, Thames presented the receipt to Salazar, who admitted that it was her receipt and her signature. The registration form taken from the Thunderbird established that the car was registered to Sergio Salazar, whom Salazar identified as her ex-husband.

After first denying she knew Martinez, Salazar then "admitted" that she knew a relative of hers. The two men denied knowing each other or the other women. The agents nonetheless believed the two cars had acted in conjunction and therefore placed Mendoza and Salazar under arrest.

After they were advised of their rights, Mendoza, Salazar, Gomez, and Martinez told conflicting stories. Gomez told an agent that he and his girlfriend, Martinez, had traveled from Plainview, Texas, in the Thunderbird and had dropped off a friend in Lajitas, Texas, where they had stayed for several hours. Gomez could not, however, provide the name or

a description of the friend he had dropped off. Gomez admitted that he knew Mendoza, as they worked at the same meat-packing plant.

Mendoza told agents that he had no knowledge of the marihuana in the Thunderbird but admitted that he knew Gomez and Martinez through his girlfriend Salazar. He stated that he and Salazar had gone to Ojinaga, Mexico, to drop off his brother. According to Mendoza, after they did so, he and Salazar spent the night in Ojinaga, then went to Lajitas to visit a friend. Mendoza could not, however, identify where this friend lived. In Lajitas, they ran into Gomez and Martinez at a gas station, and all proceeded to return to Plainview.

Salazar told agents that she and Mendoza traveled to Ojinaga to drop off a friend of Mendoza's (as opposed to Mendoza's account in which they dropped off his brother). She first denied knowing Gomez and Martinez beyond having seen them before, but later admitted that she was Martinez's aunt. Salazar told agents that she had previously sold the Thunderbird to an unknown person. Despite these statements, Gomez, Martinez, and Salazar gave the same home address.

Mendoza, Salazar, and Gomez were tried together. Martinez testified for the defense but gave a very different account from those offered at the time of arrest. She testified that she traveled to Mexico in the Maxima with Gomez, Salazar, and Mendoza. According to Martinez, she alone picked up the Thunderbird with its load of marihuana from a man named "El Compadre" while Gomez, Salazar, and Mendoza were out shopping and eating. El Compadre was to pay her $100 per pound to transport the marihuana. As to how El Compadre happened to possess a vehicle registered to Salazar's ex-husband, Martinez testified that she informed El Compadre that the vehicle was for sale when Salazar was selling the Thunderbird. According to Martinez, none of her companions knew about the drugs in the car, and Mendoza was not scouting ahead to warn of law enforcement. Gomez also testified, stating that the four traveled to Mexico in the Maxima, that Martinez had obtained the Thunderbird, and that it was merely coincidence that Mendoza and Salazar drove ahead of them to the checkpoint.

II.

A.

Mendoza argues that the evidence is insufficient to support his conspiracy conviction. Although he admits he was not truthful regarding his relationship with Gomez and Martinez, Mendoza argues that there is no evidence of a lead-car/load-car arrangement and no other evidence connecting him with the drugs.

Mendoza made motions for judgment of acquittal at the close of the government's case and at the close of all of the evidence, so the standard of review in assessing his sufficiency challenge is whether, considering all the evidence in the light most favorable to the verdict, a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *See United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd*, 462 U.S. 356 (1983). "Direct and circumstantial evidence are given equal weight, and the evidence need not exclude every reasonable hypothesis of innocence." *Gonzales*, 79 F.3d at 423.

"To establish a drug conspiracy under § 846, the government must prove beyond a reasonable doubt (1) an agreement between two or more persons to violate the narcotics

laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate voluntarily in the conspiracy." *United States v. Inocencio*, 40 F.3d 716, 725 (5th Cir. 1994). The elements of the conspiracy may be established by circumstantial evidence and "may be inferred from the development and collocation of circumstances." *Gonzales*, 79 F.3d at 423 (internal quotation marks omitted). The government must, however, "do more than pile inference upon inference upon which to base a conspiracy charge." *United States v. Williams-Hendricks*, 805 F.2d 496, 502 (5th Cir. 1986) (internal quotation marks omitted). Likewise, "the government may not prove up a conspiracy merely by presenting evidence placing the defendant in a climate of activity that reeks of something foul." *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992) (internal quotation marks omitted).

We have previously considered sufficiency challenges in lead-car/load-car scenarios. In *United States v. Barnard*, 553 F.2d 389 (5th Cir. 1977), we upheld conspiracy and possession convictions of Barnard, the lead-car driver. A Border Patrol officer was passed by two vehicles proceeding northbound approximately one mile apart. The lead vehicle was an MG sports car with two occupants that had a citizen's band (CB) radio antenna, the driver of which appeared to be talking into a microphone as the MG passed. *See id*. at 391. The second vehicle was a white Mercury that also carried a CB antenna. *See id*. The two vehicles had the same three-letter prefix on their license plates, indicating that both automobiles were registered in the same county. *See id*. The driver of the Mercury appeared nervous, looking repeatedly at the officer, and the rear end of his car appeared to be riding low. *See id*.

The officer followed the now erratically-driven Mercury for a distance, during which time the MG varied its speed to maintain a constant distance between it and the Mercury. *See id*. When the officer stopped the Mercury, the MG accelerated out of sight. *See id*. The Mercury's trunk contained eighty-four pounds of marihuana. *See id*.

We found the evidence sufficient to support Barnard's conspiracy conviction, considering the evidence of concerted action already discussed and the following additional evidence: (1) Barnard's passenger in the MG was the son of the owner of the Mercury; (2) that passenger's wallet was found in the glove compartment of the Mercury, including his driver's license and business card; (3) a shaving kit with the inscription "C. E. Barnard" was found in the front seat of the Mercury; and (4) hanging in the back seat of the Mercury was a sweater with a laundry tag marked "E. Barnard." *See id*. at 393.

Mendoza stresses that, unlike in *Barnard*, there is no evidence of concerted driving responses between Mendoza and the Thunderbird, except that Mendoza's vehicle was, at one point in time, approximately one mile ahead of the Thunderbird. Rather than conforming to the erratic behavior of the Thunderbird, Mendoza continued driving toward the checkpoint. Also unlike the situation in *Barnard*, in which the vehicles were equipped with and in which Barnard was seen using, compatible communications devices, no communications device was found in the Maxima or Thunderbird or on the person of Mendoza or any of his co-defendants.

As in *Barnard*, however, there is a connection between Mendoza's passenger and the load car. In *Barnard*, the load car belonged to

the passenger's father, and the passenger's wallet was found in the load car. In the case *sub judice*, the load car was registered to the passenger's ex-husband, and a receipt signed by the passenger was found in the load car. Although there were no personal items connecting the driver, Mendoza, to the load car, there was testimony that Mendoza, Salazar, Gomez, and Martinez had traveled to Mexico together and that Mendoza gave materially false statements to officers regarding his recent actions and his associations with Gomez and Martinez.

In *United States v. Villarreal*, 565 F.2d 932 (5th Cir. 1978), we again affirmed the conspiracy conviction of a lead-car driver. The evidence demonstrated that the lead and load cars had traveled together from the border for over an hour; both vehicles were equipped with CB radios; when the lead car approached the checkpoint, the passenger ducked beneath the dashboard in a manner that suggested that he was making a furtive call to the load car; the load car made a U-turn and turned into a rest stop; the load car had been lent to the passenger of the lead car; and both occupants of the lead car left footprints at the site where the marihuana had been delivered and loaded into the load car. *See id.* at 934-35, 938.

In *United States v. Inocencio*, 40 F.3d 716 (5th Cir. 1994), we upheld conspiracy and possession convictions in a lead-car/load-car scenario. The following evidence supported the existence of a conspiracy: coconspirator testimony linking the drivers of the lead and load cars to the pivotal figure of the conspiracy; two-way radios in the lead and load cars programmed to the same frequency; agent testimony that the lead car circled not far from the checkpoint, as if waiting for the load car; the lead car driver's nervousness and evasive-

ness when questioned about the two-way radio; papers in the lead car containing business and pager numbers for the driver of the load car; a photograph in the lead car picturing the driver of the lead and load cars together; and evidence of cell phone calls between the driver of the lead car and the pivotal figure of the conspiracy. *See id.* at 720-21, 726.

Mendoza is correct that *Villarreal* and *Inocencio* contained more evidence of a lead-car/load-car scenario than does the case *sub judice*, most notably because the Maxima and Thunderbird did not contain electronic means of communication. Such communication is not, however, essential to facilitate a lead-car/load-car transport. Absent communication devices, the lead car could travel first to the checkpoint, and either turn around (or not turn around, depending on the agreement) if the checkpoint is active, thus warning-off the load car. Here, the load car may have felt compelled to continue toward the checkpoint because Graham followed it to the rest area and waited for it to continue.

Moreover, to affirm a conviction we need not find evidence so overwhelming that it matches that contained in all our precedent. Instead, we need only conclude that, viewed in the light most favorable to the government, the evidence is sufficient to allow a reasonable trier of fact to find guilt beyond a reasonable doubt. The government proved a link between the two vehicles through Salazar's receipt and the registration of the Thunderbird to Salazar's ex-husband. Martinez and Gomez testified that all four defendants traveled to Mexico in the Maxima.

Mendoza admits these connections between the two vehicles but denies they were functioning as a lead-car and load-car. Given his ma-

terially false statements to the police, however, and given the connections between the Maxima and Thunderbird, a reasonable juror could conclude that Mendoza had knowledge of the marihuana and that the cars were indeed engaged in a lead-car/load-car transport.

## B.

To prove possession with intent to distribute under § 841(a)(1), the government must establish, beyond a reasonable doubt, knowing possession of contraband with intent to distribute. *See id.* at 724. Possession may be actual or constructive. *See id*. In a hidden-compartment case such as this, "[p]ossession of or control over a vehicle does not, standing alone, suffice to prove guilty knowledge." *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990). Nervousness, conflicting statements, and implausible stories can be sufficient to demonstrate guilty knowledge, however. *See Inocencio*, 40 F.3d at 725.

The government concedes that Mendoza did not actually possess the marihuana but argues that he constructively possessed it as driver of the lead car in a lead-car/load-car scheme. Indeed, in *United States v. Quiroz-Hernandez*, 48 F.3d 858, 868 (5th Cir. 1995), we held that "[c]o-conspirators may also be liable for the substantive offenses committed by other members of the conspiracy in furtherance of the common plan" (quoting *United States v. Lopez*, 979 F.2d 1024, 1031 (5th Cir. 1992)). "Therefore, a defendant can be liable for a possession conviction on the basis of both his constructive possession over the contraband and his status as a co-conspirator." *Id.* (citing *Lopez*, 979 F.2d at 1031). "[T]he jury could infer [the defendant's] joint control over the contraband from his presence at the scene and all the events leading to the . . . van's ex-

change of drivers. The jury could rationally conclude that [defendant] knowingly possessed the cocaine . . . ." *Id.*

Here, to the same effect, the jury could infer that Mendoza constructively but knowingly possessed the marihuana because of his obvious involvement in the conspiracy and the conflicting stories he gave. All this is sufficient to establish the requisite guilty knowledge.

AFFIRMED.