IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 12, 2008

Charles R. Fulbruge III
Clerk

No. 06-51552
Summary Calendar

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

RICARDO RENEE SANCHEZ-GONZALEZ

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:05-CR-869-2

Before KING, DAVIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Ricardo Sanchez-Gonzalez ("Sanchez") appeals the district court's denial of his motion to suppress evidence obtained after his arrest. Sanchez was convicted of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and § 846, conspiracy to import cocaine, in violation of 21 U.S.C. § 952(a) and § 960(a)(1), (b)(1), possession of cocaine with

[*] Pursuant to 5TH CIR. R. 47.5, this Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and importation of cocaine, in violation of 21 U.S.C. § 952(a), § 960(a)(1), (b)(1). Immigration and Customs Enforcement ("ICE") agents arrested Sanchez because they believed he was acting as a "scout" for a car they had previously determined to be transporting drugs across the U.S.-Mexico border. For the reasons stated below, we affirm the district court's rulings and sustain Sanchez's convictions.

## I. FACTS AND PROCEEDINGS

On August 26, 2005 immigration inspectors at the Eagle Pass, Texas port of entry into the United States determined that a Mercury Cougar driven by Alonso Mercado-Espino ("Mercado") contained cocaine. ICE agents decided to place the Cougar under surveillance without alerting Mercado to the fact that they had discovered the drugs in his car, an operation which is known as a "tail-out."

After crossing the border into Texas, Mercado parked and entered a Dairy Queen where he ordered food and sat for about twenty minutes. An undercover ICE agent entered the store and overheard Mercado speaking in Spanish on a cell phone. The ICE agent heard Mercado say "there's no problem," "where are you?" and "what are you driving?" After this conversation, Mercado grabbed his food, threw it away, and quickly left the Dairy Queen.

Outside of the Dairy Queen, ICE agents observed the driver of a gold Ford Taurus parked two spaces away from the Cougar wave to Mercado, and they observed Mercado waving back. The Taurus driver was Sanchez. Mercado got into the Cougar and pulled out of his parking space. Mercado then waited for Sanchez to pull out of his parking spot and exit the Dairy Queen parking lot in front of him. At this point, agents ran a check to verify the registration information on Sanchez's car. They discovered that Sanchez had crossed the U.S.-Mexico border at Eagle Pass that afternoon at 12:36 p.m., five minutes before Mercado arrived at the same port of entry.

With Sanchez in the lead, the two cars proceeded to an Exxon station. Although there was other traffic on the road and at times the two cars were separated by other vehicles, Mercado continued to follow Sanchez, mimicking lane changes and slowing down at the same time. At the Exxon station, Mercado waited in line for a gas pump while Sanchez parked in front of the convenience store. Sanchez looked under the hood of his car and then entered the store with his young son, who traveled with him, to purchase a snack. Sanchez and Mercado left the Exxon convenience store at the same time but did not acknowledge each other's presence. Mercado and Sanchez drove out of the Exxon station within moments of each other and proceeded to Highway 57 toward San Antonio, Texas. At this point, Sanchez followed Mercado.

At the suppression hearing, ICE agents testified that drug traffickers frequently use a "load car-scout car" arrangement in which the load car carries the drugs and the scout car travels behind it to inform the owners of the drugs if anything happens to the load car, and to distract the police if the need arises. Based on their observations of the interaction between Sanchez and Mercado at the Dairy Queen and the way that the two cars traveled together to the Exxon and left the gas station in tandem, coupled with their knowledge that Mercado carried cocaine in a hidden compartment in the Cougar, ICE agents believed that Sanchez was acting as a scout for Mercado.

Once it became clear that Sanchez and Mercado were leaving Eagle Pass, an ICE agent in an unmarked vehicle sped ahead of them to alert officers at the Highway 57 Border Patrol checkpoint.[1] Shortly thereafter, another ICE agent pulled Mercado over and arrest him. Sanchez, who was traveling behind Mercado at the time of the stop, proceeded to the Border Patrol checkpoint, where he was arrested by ICE agents. ICE agents testified that they did not see

---

[1] ICE officers testified that they planned to arrest Sanchez at the checkpoint to protect the child traveling with him from the danger of a high-speed chase.

Sanchez make any phone calls between the time Mercado was pulled over and the time he arrived at the checkpoint. Sanchez and his son were transported to the Eagle Pass ICE station. ICE agents sought basic biographical information from Sanchez, but they did not question him extensively until after Sanchez's wife arrived to pick up his son.

Sanchez was informed of his rights, but waived them orally and in writing, and eventually wrote out a confession in which he admitted that he had been promised $500 to escort a car to San Antonio, and that he was aware that he was agreeing to be involved in something illegal. He was charged with conspiracy to possess with intent to distribute cocaine, conspiracy to import cocaine, possession of cocaine with intent to distribute, and importation of cocaine.[2] He moved to suppress his confession and all the evidence produced after his arrest as the fruit of an unlawful seizure. The district court denied his motion after a hearing, and the jury convicted Sanchez of all four counts against him. He was sentenced to four 120-month terms of imprisonment and five years of supervised release. Sanchez now appeals the denial of his motion to suppress and the jury verdict against him.

## II. STANDARD OF REVIEW

"When reviewing a ruling on a motion to suppress, [this Court] reviews questions of law de novo and findings of fact for clear error." United States v. Valadez, 267 F.3d 395, 397 (5th Cir. 2001). This Court "view[s] the evidence in the light most favorable to the party that prevailed in the district court." Id.

This Court reviews the sufficiency of the evidence de novo. United States v. Burns, 162 F.3d 840, 847 (5th Cir. 1998).

> In evaluating the sufficiency of the evidence we must affirm the verdict "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a

---

[2] Mercado was charged as a codefendant in the same indictment, but he plead guilty.

reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict."

Id.  (quoting United States v. Myers, 104 F.3d 76, 78 (5th Cir. 1997)).

## III.  DISCUSSION

Sanchez argues that the evidence obtained after his arrest, including his confession, should be suppressed because ICE agents lacked probable cause to arrest him.  Sanchez also argues that without the evidence obtained after his arrest, the remaining evidence against him is not sufficient to sustain his conviction.

## A. Motion To Suppress

Sanchez argues on appeal that any probable cause which ICE agents had to arrest him for being a scout driver dissipated when he failed to call the drug owners and alert them of Mercado's arrest, as a scout driver would be expected to do.  He argues that the evidence gathered following his arrest must therefore be suppressed as the "fruit of the poisonous tree."  Wong Sun v. United States, 371 U.S. 471, 488 (1963).

"'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  In evaluating whether probable cause exists, we consider the "collective knowledge" of the ICE agents involved in the tail-out operation which led to Sanchez's arrest.  United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977).  Agents evaluating whether probable cause exists are permitted to rely on their specialized training and experience.  Id.

This Court recognizes the load car-scout car pattern of travel, "whereby two cars travel together during a smuggling venture with the first car operating primarily as a scout car."  United States v. Barnard, 553 F.2d 389, 392 (5th Cir.

1977) (quoting United States v. Vital-Padilla, 500 F.2d 641, 643 (9th Cir. 1974)); see also United States v. Lopez, 911 F.2d 1006, 1009 (5th Cir. 1990) (recognizing that "vehicles . . . traveling in tandem, lead car-load car arrangement, is a circumstance that 'may understandably raise the officer's suspicions'") (quoting Barnard, 553 F.2d at 392). This Court has also stated that when contraband is discovered in the load car, officers have reasonable cause to believe that the scout car was involved in a criminal activity. Barnard, 553 F.2d at 392.

We note at the outset that this is not a case in which the load car-scout car driving pattern created reasonable suspicion of smuggling activity. Cf. Lopez, 911 F.2d at 1009. When Sanchez was arrested, ICE agents already knew that Mercado's car was carrying cocaine in a hidden compartment. Agents relied on their knowledge of the load car-scout car pattern to conclude that Sanchez was participating in Mercado's drug-smuggling activity, which gave them probable cause to arrest him.

At the time of Sanchez's arrest, agents had been observing Sanchez and Mercado for several miles. They knew that Mercado had a cell phone conversation in the Dairy Queen in which he asked what the person on the other end of the line was driving, and that immediately after this conversation, Mercado left the restaurant.[3] In the parking lot, agents observed Sanchez wave at Mercado, and they saw Mercado return the wave. They also ran a registration check and discovered that the two cars had entered the same border crossing within five minutes of one another that afternoon.

Agents observed the two cars proceed together to the same gas station, and they saw that Mercado and Sanchez did not speak to each other or otherwise

---

[3] Sanchez correctly points out that Mercado's cell phone records revealed that Sanchez was not the person on the other end of the line during this conversation. This does not change the relevance of the overheard conversation to our present analysis, however. There was no way for the agents who overheard the suspicious conversation to know who Mercado was speaking to, and it was reasonable for them to conclude based on the part of the conversation they overheard that Mercado was speaking to the driver of a car he planned to travel with.

acknowledge each others' presence while they were both in the gas station convenience store.  As the district court noted, this absence of communication was in itself suspicious:

> If [Mercado and Sanchez] were simply friends, waiving to one another across a parking lot, as [Sanchez] would have this Court believe, then surely the two friendly men would have struck up a conversation inside the Exxon station when distance was not a factor as it was in the parking lot.

After acknowledging one another in the Dairy Queen parking lot and driving to the same gas station, Mercado and Sanchez then ignored one another at the Exxon— yet still left the crowded gas station at the same time and took the same highway to San Antonio.  The facts known to the agents at the time of Sanchez's arrest were more than sufficient to cause a reasonable person to believe that a crime was being committed.  DeFillippo, 443 U.S. at 37.

Once on the highway, Sanchez drove some distance behind Mercado, a circumstance which this Court has noted cuts against the load car-scout car inference.  Barnard, 553 F.2d at 392 n.5 (discussing the scout car's role in alerting the load car to upcoming checkpoints and stating that "it would be improper to infer that the lead car-load car scheme was being used when the purported scout car was actually following, rather than preceding, the load car").  At the suppression hearing, ICE agents testified that scout cars can serve "multiple functions" and that sometimes  a scout car "follows the narcotics . . . just to make sure nothing happens to [them]." Under the totality of the circumstances known to the agents at the time of Sanchez's arrest, particularly the pattern of tandem driving between Sanchez and Mercado prior to their entry on the highway, it was not unreasonable for the agents to believe that Sanchez was acting as a scout for Mercado in spite of the fact that Mercado pulled ahead on the highway. Clark, 559 F.2d at 424 ("In determining whether there was reasonable cause . . . we look to the totality of the circumstances and the

inferences that flow therefrom. . . . We weigh not individual layers [of evidence] but the laminated total."(internal quotations and citations omitted)).

Sanchez argues that the probable cause to believe that he was acting as a scout for Mercado dissipated when officers did not observe Sanchez making a phone call after Mercado's arrest. This argument is without merit. Sanchez points to no case from this or any other circuit which required a scout car to make contact with the owners of the contraband in order to establish a load car-scout car relationship. The agents rightly focused on the factors which established a connection between the load car and the suspected scout car, not any communication between the suspected scout and third parties. See Barnard, 553 F.2d at 392 (noting CB radio equipment and traffic pattern between two vehicles on sparsely traveled road known for smuggling activity); Lopez, 911 F.2d at 1009 (noting CB communications and observation of driving pattern of three trucks traveling in tandem and stopping at the same gas station led officers to infer illegal activity). Sanchez's behavior, combined with the border-crossing records, gave agents probable cause to believe that he was cooperating with Mercado's drug-smuggling activity. Nothing that happened on Highway 57 dissipated that probable cause, and Sanchez's arrest at the border patrol checkpoint was lawful. The evidence lawfully obtained after Sanchez's arrest is admissible.

B. Sufficiency of the Evidence

Sanchez also challenges the sufficiency of the evidence against him. He argues that the evidence obtained after his arrest should be suppressed and that the remaining evidence against him is circumstantial and insufficient to sustain his convictions. We reject this argument because we find that his arrest was lawful and that the evidence lawfully obtained after Sanchez's arrest is admissible.

We also note that the evidence obtained from Sanchez following his arrest was more than sufficient to sustain his convictions for possession and importation of a controlled substance and conspiracy to do the same. After initially lying to agents about whether he had gone to Mexico that morning, Sanchez agreed to "tell the truth" and wrote out a confession in which he admitted that a man named Juan Gonzalez had offered him $500 to follow a car to San Antonio. He told agents that he had met Juan (whom he referred to as "Juanillo") in Mexico and that Juan's boss, who was known as "Chuy," was going to pay him for his work. Sanchez wrote in his confession that it was "logical" that what he was doing was illegal.

Sanchez's confession was corroborated by his phone records. Sanchez's phone book contained phone numbers for "Juanio" and "Chuy, patron Juanio." Sanchez had two cell phones with him at the time of his arrest. One of the phones, which was registered in the name of "Juanillo Gonzalez," recorded calls from the numbers for "Juanio" and "Chuy" on the date of his arrest. Mercado's cell phone received calls from the same two numbers that day. This evidence, combined with the evidence which led the agents to arrest him, was more than sufficient to permit a rational jury to conclude that Sanchez knowingly participated in a conspiracy to possess, import, and distribute a controlled substance in the United States.

## IV. CONCLUSION

The judgment of the district court is AFFIRMED.