NO.
07-09-0290-CR

IN
THE COURT OF APPEALS

   FOR THE SEVENTH DISTRICT OF TEXAS

   AT AMARILLO

FEBRUARY
10, 2010

___________________________________

       JOSE
EVER GONZALEZ-GILANDO,





Appellant





v.

      THE STATE OF TEXAS,

 

_________________________________

 

FROM THE 69TH
DISTRICT COURT OF HARTLEY COUNTY;

 

     NO.
1018H; HON RON ENNS, PRESIDING

______________________________________

OPINION

______________________________________

 

Before QUINN,
C.J., and CAMPBELL and HANCOCK, JJ.

 Jose Ever
Gonzalez-Gilando pled guilty to possession of a
controlled substance with intent to deliver. 
On appeal, he challenges the trial court=s
denial of his motion to suppress contending there was no reasonable suspicion
for an investigative stop.  We agree and
reverse the judgment. 

Background












On November 19, 2008, Troopers Chad Foster and Jacob
Gamez were on patrol on Highway 385 in Hartley
County.  The highway, purportedly, was a
main traffic route for drug dealers.  The
officers observed a vehicle pass them in the opposite direction and decided to
turn and follow it.  They grew suspicious
of whom they saw because 1) the vehicle in which they rode was clean or lacked
road grime, 2) the young occupants did not Afit@ the year and model of the vehicle, the latter being
a >99 Lumina, 3) the troopers thought the vehicle=s occupants should have been in a sportier car, 4)
both occupants simultaneously looked away from the officers as the vehicles met
and passed, 5) the occupants turned their hats around so they faced forward
after passing the troopers, 6) the car slowed and came to almost a complete
stop at a blinking caution light adjacent to an intersection, and 7) the driver
drove within the speed limit.  

The troopers also checked a computer database to
determine whether the vehicle in question was lawfully registered and whether
it was covered by liability insurance. 
While it was discovered that the car was lawfully registered, the
information regarding insurance was unavailable.  In other words, the information garnered from
the database did not provide the troopers basis to confirm whether or not such
insurance existed.  According to one
trooper, the circumstance meant the car could or could not have been
covered.  Because they concluded that
they could not stop the car, they decided to call a local deputy sheriff
(Fowler) to intercede.[1]













Fowler responded, caught up with the moving
vehicles, placed his patrol unit between that in which appellant rode and that
of the troopers, ran the license plate, and also determined that the vehicle he
was following had a current registration. 
So too did his search for the existence of potential liability insurance
result in the discovery that the information was Anot
available@ or the status Aundocumented.@  Nonetheless,
he decided to conduct a traffic stop of appellant and his companion.  The stop eventually resulted in the discovery
of the controlled substances underlying appellant=s
conviction. 

Standard of Review

We review the trial court=s ruling on a motion to suppress under the standard
discussed in Ford v. State, 158 S.W.3d 488 (Tex. Crim. App. 2005).  It requires us to give great deference to the
trial court=s interpretation of historical fact and assessment
of a witness=
credibility.  Id. at
493.  However, we need not give
such deference to its application of the law to the facts, especially when
those facts are undisputed.  Neal v.
State, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008), cert. denied, __
U.S. __, 129 S.Ct. 1037, 173 L.Ed.2d 471 (2009).  In that situation, we consider the matter de
novo.  Id.   

Applicable Law

Next, law enforcement personnel may briefly detain
and investigate a person when they have a reasonable suspicion that the person
is involved in criminal activity.  State v. Sheppard, 271 S.W.3d 281, 287 (Tex. Crim. App.
2008).  The officer must be able
to point to something that would lead a reasonable person to believe that the
person being detained was engaged in, had engaged in, or was about to engage in
a criminal act.  Klare
v. State, 76 S.W.3d 68, 72 (Tex. App.BHouston [14th Dist.] 2002, pet. ref=d).  Those
specific articulable facts must amount to more than a
mere hunch or suspicion.  Davis v. State, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).  And, we look at the totality of the
circumstances in determining reasonable suspicion.  Ford v. State, 158
S.W.3d at 492-93.  Finally, the
subjective intent of the officer has no bearing on the matter.  Id. at 492.

Application of Law to Facts   

Regarding the indicia other than that concerning
insurance, none evinced criminal activity or a reasonable suspicion that
criminal activity was afoot.  This is so
irrespective of whether they are viewed separately or en masse.  

It is not a crime in this State to drive a clean
car, look away from passing police officers, drive a vehicle of one=s choice, obey traffic warnings, and abide by posted
speed limits.  Nor did either the State
or officers proffer reasonable explanation as to how one could rationally
interpret such conduct as potentially criminal. 
For instance, we are left to guess at why a young adult driving an older
car insinuated that he was a criminal. Moreover, accepting such a proposition
would be tantamount to concluding that only those young adults without
sufficient means to acquire a newer car engage in criminal activity, and such
is not the case.  Similarly insupportable
is the notion that following traffic laws and heeding traffic warnings connotes
some manner of misconduct.  Rather,
following the law tends to suggest that one is engaging in lawful activity, and
we hesitate to conclude otherwise without basis for doing so.     












As for looking away from police officers, that too
is a highly dubious indicia since others have opined
that looking at officers is equally suspicious. 
E.g., U.S. v. Barnard, 553 F.2d 389,
391-92 (5th Cir. 1977). 
If one acts suspiciously by both looking at and away from the police,
then that seems to leave no option other than to move around with eyes
closed.  Of course, the police would most
certainly deem the latter grounds for a stop if undertaken by someone driving
(and rightly so).  From early school
days, many come to believe that avoiding eye contact with authority figures is
a way to avoid notice or otherwise be left alone.  A student looking down in the classroom upon
the teacher asking a question does not ipso facto mean the student
committed a misdeed.  The same can be
said of those who look away from law enforcement officials while driving on the
roadway.  And, the State failed to
explain why the contrary is true.  

And, while it may be true that innocent people often
drive dirty cars, that hardly means that those driving
newly washed cars are violating or are about to violate the law, and
vice-versa.  

It seems as though the situation before us
exemplifies the nature of criminal conduct in general.  Simply put, criminality encompasses most any
imaginable fact or circumstance. 
Criminals come in all makes and colors. 
Some have hair, some do not.  Some
are men, some are not.  Some drive cars,
some do not.  Some wear suits, some do
not.  Some have baseball caps, some do
not.  Some want attention, some do
not.  Some have nice cars, some do
not.  Some eat spaghetti, some do not.  And, sometimes, some even engage in innocent
activity.  Yet, just because an officer
once encountered a bald male who ate spaghetti while wearing a suit who later
drove away in a particular car and ultimately engaged in criminal conduct does
not permit him to rationally deduce that everyone else who happens to do the
same things may also be engaging in misconduct. 
The same is no less true here.  It
may well be that the officers have seen young people who drive older cars and
obey traffic laws engage in illegal activity. 
But, that does not mean it is reasonable to infer that all, most, or
some other young people who do likewise must be breaking the law.  












People are free to drive any type of vehicle they
choose, slow at a blinking yellow light, look at whom they choose while
driving, and maintain a speed below the limit without expecting to be pulled
over by law enforcement officers.  See
Klare v. State, 76 S.W.3d at 72 (stating that
innocuous conduct alone does not justify an investigative stop); Sieffert v. State, 290 S.W.3d 478, 484-85
(Tex. App.BAmarillo 2009, no pet.) (concluding
that driving a vehicle through a high crime area late at night at a speed lower
than the speed limit while appearing nervous did not evince reasonable
suspicion to believe criminal activity was afoot).  Moreover, our decision remains the same even
when we factor into the equation the information at bar regarding the existence
of insurance, or lack thereof.  












Drivers are required to maintain proof of financial
responsibility to lawfully drive on our public roads.  See Tex.
Transp. Code Ann. '601.051 (Vernon 1999).  Furthermore, modern technology has apparently
given police officers the means to assess one=s
compliance with that requirement without stopping the individual.  Here, however, the information obtained by
the officers while pursuing those technological means was hardly suggestive of
anything other than the unknown.  Again,
the officers simply were informed that the data they desired was
unavailable.  And, while Fowler
unilaterally opined that this Aled him to believe that the vehicle did not have
insurance coverage,@[2] without other evidence developing the source of the
information comprising the database, explaining what was meant when insurance
information was unavailable, explaining why such information would be
unavailable, illustrating the accuracy of the database, establishing the
timeliness of the information within the database, depicting how often those
using the database were told that insurance information was unavailable,
proving that the program through which the database was accessed was even
operating at the time, and the like, we cannot accept the deputy=s inference as reasonable.[3]  

Given the absence of the evidence described above,
we can only liken the indication that the information was unavailable to Awho knows,@ and Awho knows@ falls short of being an articulable
fact upon which reasonable suspicion can be founded.  Thus, the State failed to carry its burden
and prove that the stop at issue was based on either reasonable suspicion or
probable cause and, thereby, was legitimate. 
This, in turn, leads us to conclude that the trial court erred in
denying appellant=s motion to suppress.

Without the drugs ultimately discovered in the car,
the State had little or no evidence of appellant=s
guilt.  Thus, authorizing their use to
convict him was harmful.  Accordingly, we
reverse the judgment and remand the cause to the trial court.

 

Brian Quinn 

Chief Justice   


Publish.         













[1]This is somewhat reminiscent of the
Life commercials of yesteryear where the older siblings were hesitant to taste
the cereal.  So, they decided to call AMikey@ because AMikey would eat anything.@ 
Maybe each of us is guilty of doing this at one time or another.





[2]A trooper testified otherwise, saying
that Athey could have insurance or they
may not have insurance.@ 





[3]The State argues in
its brief that, pursuant to the Texas Administrative Code, the reliability rate
of the information provided by insurers must meet 95% by January 1, 2008. See
28 Tex. Admin.
Code '5.605(b) (2009).  However, nothing in the record shows that the
administratively-required goal was attained.